## OPINION OF THE JUSTICES TO THE SENATE AND HOUSE OF REPRESENTATIVES.

The question whether a bill or resolve appropriating money from the Treasury of the Commonwealth is a money bill, which must, by the Constitution, c. 1, sect. 3, art. 7, originate in the House of Representatives, is a question upon which the two branches of the Legislature are authorized by the Constitution, c. 3, art. 2, to require the opinion of the Justices of the Supreme Judicial Court.

The exclusive privilege of the House of Representatives, under the Constitution of the Commonwealth, c. 1, sect. 3, art. 7, to originate money bills, is limited to bills that transfer money or property from the people to the State, and does not include bills that appropriate money from the Treasury of the Commonwealth to particular uses of the government, or bestow it upon individuals or corporations.

To the Honorable the Senate of the Commonwealth of Massachusetts : [1]

On the nineteenth day of April last the Honorable Senate adopted an order, which was transmitted on the next day to the Justices of the Supreme Judicial Court, requesting their opinion upon the following questions :

" First. Can the Senate, under the provisions of chapter 1, section 3, article 7, of the Constitution, originate a bill or resolve appropriating money from the Treasury of the Commonwealth ?

" Second. Can the Senate, under said provisions, originate a bill or resolve, in any way involving, directly or indirectly, the expenditure of money from the Treasury, or imposing any burden or charge thereon ? "

On the twenty-second day of April the Honorable House of Representatives adopted an order, which was on the next day transmitted to the Justices of the Supreme Judicial Court, requiring their opinion upon this question :

" Is the power to originate a bill appropriating money from the State Treasury limited by the Constitution to the House of Representatives, or does it reside in both branches of the Legislature ? "

On the third day of May the Justices of the Supreme Judicial Court, having taken these questions into consideration, addressed a communication to the Honorable Senate, and a like communi-

---

[1] A duplicate of this opinion was addressed to the Honorable the House of Representatives.

cation to the Honorable House of Representatives, respectfully asking to be furnished with copies of any pending bills or resolves, upon which the questions propounded by that House to which the communication was addressed had arisen, as well as with any precedents from the journals or documents of the General Court, before or since the adoption of the Constitution of the Common- wealth, which that House might be pleased to communicate; and informing each House of the communication so made by the Justices to the other House.·

In answer to these communications, the Justices received from the presiding officers of the two Houses copies of a resolve and of a bill.

By the resolve, after reciting that Thomas Cahill, formerly of Boston, had been arrested in Ireland, at the instance of officers acting in behalf of this Commonwealth, on the charge of having committed a murder here, and had been by them brought to this Commonwealth, and imprisoned for a long time, and then released without trial, and thereby had suffered greatly in body and mind, and had been put to large expense, and obliged to return to Ire- land without any decision by the courts as to his guilt or inno- cence, it was " Resolved, that the sum of one thousand dollars be paid to Thomas Cahill, and the same is hereby appropriated; said sum to be placed in the hands and at the disposal of the Governor, to be by him paid to said Cahill in such manner as in his judgment will best secure. to said Cahill the full benefit of the money."

The bill purports to enact that " there is hereby appropriated, to be paid from the ordinary revenue, unless otherwise ordered, a sum not exceeding thirteen thousand two hundred and seventy- seven dollars, in addition to the amount heretofore appropriated, for the support of the State Reform School for Boys at West- borough."

The Justices were informed that both the resolve and the bill originated and were passed in the Senate; that the House of Representatives refused to entertain them, on the ground that each was a money bill, within the provision of chapter 1, section 3, article 7, of the Constitution of the Commonwealth, and there- fore could not originate in the Senate; and new ones in the same words were introduced in the House.

The Justices have received from the President of the Senate his opinion upon the question, printed by order of the Senate,[1] and referring to the opinion delivered by the Honorable Robert C. Pitman (now one of the Justices of the Superior Court) as President of the Senate in 1869,[2] and from the Speaker of the House of Representatives his opinion upon the same question,[3] referring to the opinions delivered by his predecessor, the Honorable Harvey Jewell, in 1868 and 1869.[4]

The Senate appointed a special committee on the communication from the Justices (consisting of the President of the Senate and two other senators) with instructions to search for precedents; and the House of Representatives appointed a like committee (consisting of the Speaker and the chairmen of the tanding committees on Finance and on the Judiciary) to confer with the Senate, or any committee thereof, upon the communication from the Justices. Upon the report and recommendation of these committees, the two Houses, on the tenth day of May, passed the following order:

" Ordered, That the opinions of the four Justices of the Supreme Judicial Court, delivered in the Senate February 22, 1781, and now in the archives of the Commonwealth, with the lists of bills levying taxes, and bills and resolves appropriating money, which originated in the Senate between 1780 and 1790, together with the precedents extracted from the records of the General Court prior to 1780 — which lists and precedents have been collected under the direction of the Senate committee, to which a communication of the Honorable Justices of the Supreme Judicial Court was referred — be printed, and that copies thereof be transmitted to the Justices." ·

Copies of the report of each committee,[5] and of this order, with the opinions, lists, and precedents therein mentioned,[6] have accordingly been transmitted to the Justices.

These papers having been received by the Justices only three days before the final prorogation of the Legislature, and while

---

[1] Senate Doc. 1878, No. 235.    [2] Senate Doc. 1869, No. 275.
[3] House Doc. 1878, No. 310.
[4] House Doc. 1868, No. 250.    House Journal, 1869, p. 630.
[5] Senate Doc. 1878, No. 252.    House Doc. 1878, No. 356.
[6] Senate Doc. 1878, No. 253.

they were holding terms of court in various counties, it was impracticable for them to consult together and submit opinions to the two Houses at the same session. Under these circumstances, the Justices have felt, that before transmitting their opinions, in accordance with what they understand to have been the expectation of both Houses, and with the usage in similar cases,[1] to the President of the Senate and the Speaker of the House of Representatives during the recess of the Legislature, a due sense of the honor conferred upon them by requiring their opinions upon a matter of this nature, on which there has been frequent difference of opinion between the two Houses for ten years past, demanded of the Justices a thorough investigation of the subject, and a somewhat extended statement of the grounds of their conclusion.

The Justices of the Supreme Judicial Court, having now fully considered the questions upon which their opinions have been required by the Honorable Senate and the Honorable House of Representatives respectively, and the precedents communicated to them by the joint order of the two Houses, and other precedents and authorities on the subject, respectfully submit the following opinion :

The Constitution of the Commonwealth provides as follows: "All money bills shall originate in the House of Representatives; but the Senate may propose or concur with amendments, as on other bills."[2]

The questions proposed by the two Houses, although differing in form, appear to us to present substantially one and the same question; namely, whether a bill which appropriates money from the treasury of the Commonwealth, and does not provide for levying such money upon the people, by tax or otherwise, is a money bill, which must, by this provision of the Constitution, originate in the House of Representatives.

Upon first taking up this question, some of us had doubts whether it was one upon which we could properly express an opinion. Although a consideration of the precedents dispelled those doubts, it has seemed to us proper, in order to show that, in undertaking to define the constitutional authority of a branch of the Legislature, we have been cautious not to exceed our own,

---

[1] 9 Cush. 605.                    [2] Chap. 1, sect 3, art. 7.

that we should state the reasons on which it has appeared to us to be our duty to answer the question to the best of our information and abilities.

The question is indeed, in one aspect, a question of parliamentary privilege and of parliamentary procedure; but it is also a question of the construction of the Constitution of the Commonwealth, which is on this subject the supreme law.

The Constitution declares that " each branch of the Legislature, as well as the Governor and Council, shall have authority to require the opinions of the Justices of the Supreme Judicial Court upon important questions of law and upon solemn occasions." [1]   This article, as reported in the Convention that framed the Constitution, limited the authority to the Governor and Council and the Senate, and was extended by the Convention so as to include the House of Representatives; [2] and, as may be inferred from the form in which it was originally presented, evidently had in view the usage of the English Constitution, by which the King, as well as the House of Lords, whether acting in their judicial or in their legislative capacity, had the right to demand the opinions of the twelve judges of England.

The practice of the Stuart kings, in taking extrajudicial opinions of the judges upon questions about to come before them judicially, was an unconstitutional abuse of the royal authority in this respect. [3]   But, since the Revolution of 1688, so sturdy an asserter of the independence of the judges as Lord Holt joined with the other judges of the time in opinions to King William III. upon the extent of the power of pardon, [4] and to Queen Anne upon the question whether a writ of error should be granted as of right; [5] and, as late as 1760, Lord Mansfield, Chief Justice Willes, and other judges, gave an opinion to King George II. upon the jurisdiction of a court martial to try an officer, after his dismissal from the army, for a military offence committed while

---

[1] Chap. 3, art 2.

[2] Journal of Convention of 1779–80 (ed. 1832) 211, 242.

[3] *Stafford's case*, Year-Book 1 H. VII. fol. 26, pl. 1.   Lord Coke, in *Peacham's case*, 2 Howell's State Trials, 871.   3 Inst. 29.   Foster's Crown Law, 200.   Co. Lit. 110, Hargrave's note.

[4] *Fenwick's case*, Fortescue, 385.

[5] *Paty's case*, 14 East, 92, note; 14 Howell's State Trials, 861, note.

in actual service.[1]   So, under the Constitution of the Common wealth, opinions have been given by the Justices of the Supreme Judicial Court to the Governor and Council upon questions of the exercise of the power of pardon,[2] the issue of death-warrants,[3] the validity of the proceedings of a court martial,[4] and the authority of the Governor, as commander-in-chief, over the militia.[5]

We are not aware of any instance since 1760 in which the Crown has exercised the power of asking the opinion of the judges.   But the right of the House of Lords to put abstract questions of law to the judges, the answer to which might be necessary to the House in its legislative capacity, has been often acted on in modern times.[6]

There are expressions in Lord Coke's writings to the effect that the judges ought not to give opinions upon any law, custom or privilege of Parliament.[7]   But it is to be observed, that, in that passage in which he is particularly treating of their duties when summoned to act as assistants to the House of Lords in matters of law, he qualifies the statement by the words, "as hath been said;"[8] clearly signifying that he was not so much stating his own opinion, as referring, according to his habit, to the cases which appeared to support the position.[9]

The precedents referred to by Lord Coke, and which are the foundation of the theory that the judges cannot properly give an opinion upon any question of the law, privilege or custom of Parliament, are two cases in the rolls of Parliament in the reign of Henry VI.   In the one case, a question of precedency between two earls in the Parliament, the King's Council, and elsewhere, was referred by the King, by the advice of the House of Lords, to the judges, who, while observing that it was a matter of Parliament belonging to the King and to the House of Lords to determine, declared in positive terms their own opinion upon the

---

[1] *Lord George Sackville's case*, 2 Eden, 371.

[2] 13 Gray, 618.                           [3] 11 Cush. 604.

[4] 3 Cush. 586.                       .   [5] 1 Allen, 197, note.

[6] *M'Naghten's case* (1843) 10 Cl. & Fin. 200, 212–214.

[7] 4 Inst. 15, 50.   13 Rep. 63.          [8] 4 Inst. 50.

[9] O. Bridgm. 329, Hargrave's note.   Coke's Answer to King James I. about *Bonham's case*, 6 Bacon's Works (ed. 1803) 405, 407.   Prynne's Fourth Register, 648.

question submitted; and the case was decided by the King and Lords according to that opinion.[1]   In the other case, Thomas Thorp, the Speaker of the House of Commons, having been taken in execution on a judgment recovered against him by the Duke of York in a court of law, the Commons petitioned the King and the House of Lords for his discharge; and the House of Lords asked the opinion of the judges upon the question, "whether the said Thomas ought to be delivered from prison by force and virtue of the privilege of Parliament or no."   The judges, after cons. ltation, answered "that they ought not to answer to that question, for it hath not been used aforetime that the justices should in any wise determine the privilege of this High Court of Parliament; for it is so high and so mighty in his nature that it may make law, and that that is law it may make no law; and the determination and knowledge of that privilege belongeth to the Lords of the Parliament, and not to the justices."   Yet the judges went on to declare the effect allowed to such privilege of Parliament in the courts of law, and the reasons therefor.[2] It thus appears, that, in each of those cases, the judges, while recognizing that the final determination of the question belonged to the House of Lords, did give an opinion to assist the House in such determination.

It is worthy of remark, that only two years later, in Pylking-ton's case,[3] cited by Mr. Speaker Jewell, the same judges, when the validity of a particular act of Parliament was brought before them judicially, sent for the Master of the Rolls and the Clerk of the Parliament to inform them of the course of proceeding in passing bills; and that the statement, made by those officers, of the forms observed when a tax granted by the Commons was increased or diminished by the Lords, clearly shows, that, in that age, the Lords were accustomed to amend tax bills.   In the reign of Elizabeth, the House of Lords, upon a bill touching the lands of a person attainted by a former act of Parliament, required the judges to consider the question, whether, by the records of Parliament, the act of attainder appeared to have been passed in the twenty-eighth or in the twenty-ninth year of

---

[1] *Earl of Arundel's case*, Rot. Parl. 27 H. VI. No. 18.
[2] *Thorp's case*, Rot. Parl. 31 & 32 H. VI. Nos. 25, 26, 27.
[3] Year-Book 33 H. VI. fol. 17, pl. 8.

the reign, "and to declare their opinions concerning it; where-upon they saw and considered writs of summons of the Parliament, and divers patents concerning the matter," and gave an opinion, which the House acted on.[1]    And in the reign of Charles II. Lord Hale and his associates, sitting in the King's Bench, took judicial notice of the order of proceedings of the Houses of Parliament and their committees.[2]

In the reigns of Henry VIII.,[3] of Philip and Mary,[4] and of James I.,[5] the judges freely gave opinions, when required by the House of Lords, upon questions of the privilege of members of Parliament from arrest; and in the first year of Queen Elizabeth, the opinion of the judges was taken by the House of Lords upon such a purely parliamentary question as the manner of· exercising the right of voting by proxy.[6]

One other English precedent is worthy of being more fully stated.    By an act of Parliament passed in 1624, granting an aid to King James I. for the maintenance of the then expected war with Spain, it was provided, in order to secure the application of the moneys so granted to the uses mentioned in the act, that the sums levied should be paid into the hands of eight citizens of London named as treasurers, and expended only upon the warrant of ten other persons, four peers and six commoners, named as the King's council for the war, or of five or more of them; and that both treasurers and councillors should make oath for the performance of their trust, and be accountable to the House of Commons.    The bill having been brought up from the Commons, the House of Lords, before passing it, ordered all the judges to attend and deliver their opinions upon some questions of the jurisdiction and authority of the two Houses respectively, or, in the phrase of that time, "some points of judicature in the said bill."    The judges attended accordingly, and delivered an opinion as follows: "Resolved by all, with one uniform assent, that, upon perusal of the several parts of the act of sub-

---

[1] 1 Anderson, 294, pl. 303.         [2] *Lake* v. *King*, 1 Saund. 131, 133.

[3] *Ferrer's case*, 1 Hatsell's Precedents (3d ed.) 54.

[4] *Pledall's case*, 1 Commons' Journals, 46; Prynne's Fourth Register, 1213, 1214; 1 Hatsell, 74.

[5] 3 Lords' Journals, 155, 157.    1 Hatsell, 177, note.

[6] 4 Inst. 13.

sidy, they do not conceive that there is anything therein which may impeach or blemish the privilege or power of the Higher House, or add to the privileges of the Lower House, in anything, save in the particular case in question, and in no other case of the like or other nature; and that for these reasons: First, Because the judicature in this particular case is not assumed by way of privilege, to beget a precedent, but by way of act, which taketh effect, not only by themselves, but by the Lords and by the royal assent of the King; Secondly, Because the ground of this act proceeded originally from the gracious proposition of his Majesty himself, and that proposition is mentioned in the act itself; so as there is no ground to do the like hereafter, to be drawn from this act, unless it be upon the like proposition from the King, with consent of the Lords, who must fully assent unto this act." The principal judges at that time were Chief Justice Ley, Chief Justice Hobart, and Chief Baron Tanfield, all of great learning, integrity, and independence.[1] The Lords ordered the opinion to be signed by all the judges, and entered of record, and thereupon passed the bill, first, however, adopting and recording a protest, reciting "forasmuch as this act of subsidy is in many things different from the ancient usual form of a subsidy bill; and for that something in the said act contained may in time to come be construed, either to lessen the jurisdiction of the one House, or to add to the jurisdiction of the other, more than hath been used or heretofore admitted;" and therefore declaring that nothing in this act should thereafter be taken or construed to give or take any jurisdiction, power, privilege, or authority, to or from either House of Parliament, but that each should severally and dividedly hold, use, and enjoy the same liberties, privileges, powers, and jurisdictions as theretofore.[2]

In this Commonwealth, the privileges of the two Houses do not, as in England, rest merely upon legislative resolves or usages; but they are defined by the written Constitution.[3] The same Constitution which defines these privileges declares

---

[1] 6 Foss's Judges of England, 166, 330, 366.

[2] St. 21 Jac. I. c. 33; 4 Sts. of the Realm, pt. ii. 1247. 3 Lords' Journals, 406, 408.

[3] *Burnham's case*, 14 Gray, 226, 238. *Whitcomb's case*, 120 Mass. 118, 122.

that each branch of the Legislature, as well as the Governor and Council, shall have authority to require the opinions of the Justices of the Supreme Judicial Court upon important questions of law and upon solemn occasions. The opinions of the Justices can be required only " upon important questions of law," not upon questions of fact;[1] "and upon solemn occasions," that is to say, when such questions of law are necessary to be determined by the body making the inquiry, in the exercise of the legislative or executive power entrusted to it by the Constitution and laws of the Commonwealth.[2] No other limit of the authority to require the opinions of the Justices is expressed in the Constitution. In giving such opinions, the Justices do not act as a court, but as the constitutional advisers of the other departments of the government, and it has never been considered essential that the questions proposed should be such as might come before them in their judicial capacity.

For instance, opinions have been frequently required by the House of Representatives, and given by the Justices, upon questions of law concerning the election and qualifications of members, of which the House is made by the Constitution the final judge;[3] and, as appears in the collection of precedents transmitted to us by order of the two Houses, the Justices of the Supreme Judicial Court in 1781, in obedience to a joint order of the first Legislature that sat under the Constitution, delivered opinions upon the question, whether, notwithstanding the provision of the Constitution, that all money bills shall originate in the House of Representatives, " the Senate have an equal right and concern with the House of Representatives in originating and completing the settlement of a valuation."[4]

The interesting character of the precedents to which we have referred, and the want of any published collection in which they may be readily found, may, we trust, excuse the fulness with which we have stated the considerations which have satisfied us

---

[1] *Opinion of Justices*, 120 Mass. 600.

[2] *Answer of Justices*, 122 Mass. 600.

[3] Const. Mass. chap. 1, sect. 3, art 10.   3 Pick. 517.   11 Pick. 538.   18 Pick. 575.   23 Pick. 547.   1 Met. 580.   5 Met. 587, 591.   10 Gray, 613.   122 Mass. 594.

[4] *Opinions of Justices, ante*, 547.

that the orders of the Senate and of the House of Representatives present an important question of law, arising upon a solemn occasion, and upon which the two Houses are empowered by the Constitution to require our opinion. Any embarrassment that we might have felt in giving an opinion to one House upon a question affecting the constitutional powers of both has been removed by the facts that each House has proposed a similar question and that the two Houses have joined in an order transmitting to us all the precedents that either House deemed of sufficient importance to be considered.

The prominence given to the practice of the Lords and Commons in England, in the opinions heretofore delivered by the presiding officers of each branch of the Legislature of Massachusetts upon the question of the right of the Senate to originate bills or resolves appropriating money from the Treasury of the Commonwealth, makes it proper to give an outline of the history of the usage of the English Parliament before 1780 in regard to bills raising, granting, and appropriating money, having particular regard to the precedents cited in those opinions.

It was well established in England, before the emigration of our ancestors, that all grants in Parliament of subsidies to the King must begin in the House of Commons, and be first granted by them.[1] In 1628, within a year before the Massachusetts Colony Charter was granted, the preamble of an act for a grant of subsidies was framed by a committee of the Commons, which included Coke, Glanville, Selden, and other eminent lawyers, and, after conference with the Lords, was finally fixed in the form of a gift to the King from "Your Majesty's most humble and loyal subjects the Commons in your High Court of Parliament now assembled;" and the bill, after being passed by the House of Lords, was presented by the Speaker of the House of Commons to the King for his approval.[2] In 1640 a vote of the Lords, that the matter of supply should have precedence, having been sent to the Commons with a request for a conference, was resolved

[1] The Indemnity of the Lords and Commons, Rot. Parl. 9 H. IV. No. 21. 3 Hatsell (2d ed.) 133. 4 Inst. 29. Dyer, 43 b. 3 Hallam's Const. Hist. (7th ed.) 27–29.

[2] 1 Commons' Journals, 910, 914, 915, 919. 3 Lords' Journals, 858, 860, 879. St. 3 Car. I. c. 8; 5 Sts. of the Realm, 39.

by the Commons to be a breach of privilege, although the Lords at the conference declared that they "would not meddle with matter of subsidy, which belongs properly and naturally to you; no, not to give you advice therein, but have utterly declined it;" and Lord Clarendon says: "This conference was no sooner reported in the House of Commons than their whole temper seemed to be shaken. It was the undoubted fundamental privilege of the Commons in Parliament that all supplies should have rise and beginning from them."[1] Upon the Restoration of the Monarchy in 1660, the first clause in a bill for continuing customs and excises was amended so as to stand thus: "The Commons assembled in Parliament give and grant" unto the King the subsidies mentioned in the bill; and a member was appointed "to carry this bill to the Lords, and to desire the Lords, that, it being a bill concerning money, it be sent back to this House when the Lords have passed it." The Lords passed the bill in this form, and returned it to the Commons, who presented it by their Speaker to the King.[2] The proceedings in England upon all bills of supply have since conformed to this precedent.

The right of the Lords to reject bills of supply and taxation was admitted; and their right to amend such bills does not appear to have been denied by the Commons before 1671.[3] In that year, on a bill for an imposition on foreign commodities, the House of Commons unanimously resolved, "that, in all aids given to the King by the Commons, the rate or tax ought not to be altered by the Lords," and asserted "that there is a fundamental right in that House alone, in bills of rates and impositions on merchandise, as to the matter, the measure and the time." The Lords, on the other hand, resolved with equal unanimity that the power exercised by them in making amendments and abatements, "as to the matter, measure and time, concerning the rates and impositions on merchandise, is the fundamental, inherent and undoubted right of the House of

---

[1] 2 Commons' Journals, 13.    3 Hatsell, 102, & note.    1 Clarendon's Hist. (ed. 1849) 190.

[2] 8 Commons' Journals, 98, 102.    11 Lords' Journals, 105, 109.    St. 12 Car. II. c. 4; 5 Sts. of the Realm, 181.

[3] 3 Hatsell, 136.    Hale on Parliaments, 65, 66.    Report of Select Committee on Tax Bills, 1860, appendix, pp. 7, 12, 13.    3 Hallam, 30.

Peers, from which they cannot depart." [1] In 1678, on a supply bill being amended by the Lords, the House of Commons carried their doctrine still farther, and passed a resolution, "that all aids and supplies, and aids to his Majesty in Parliament, are the sole gift of the Commons; and all bills for the granting of any such aids and supplies ought to begin with the Commons; and that it is the undoubted and sole right of the Commons to direct, limit and appoint, in such bills, the ends, purposes, considerations, conditions, limitations and qualifications of such grants; which ought not to be changed or altered by the House of Lords." [2] On both those occasions, the controversy between the two Houses was terminated by a prorogation of Parliament.[3] But the resolution of 1678 has been often re-affirmed by the Commons, and made the foundation of their claim of privilege in matters of supply; and the Lords, though they have never expressly disclaimed the right to amend bills of supply, have never since practically asserted it when controverted by the Commons.[4]

The Commons, up to that time, had not undertaken to extend their exclusive privilege to the imposing or distribution of penalties.[5] But in many instances from 1690 to 1696, and again in 1702, the Commons denied, and the Lords maintained, the right of the latter to insert clauses inflicting or altering the application of pecuniary penalties.[6] In 1696 the reason assigned by the Commons is, that "their Lordships have added and imposed pecuniary penalties upon the subject; whereas all charges of money upon the people ought to begin with the Commons;" and the Lords, on the other hand, "conceive that the imposing of pecuniary penalties of this nature is no charging of money upon the people; because nothing can truly be called so, which is within the people's choice not to pay, if they please; as they need not to do in this case, unless they will wilfully break the law, which is made for the welfare of the State, and not for tax-

---

[1] 9 Commons' Journals, 235, 239.   3 Hatsell, 110, 368, 370, 371.

[2] 9 Commons' Journals, 509.   3 Hatsell, 112, 137, 407.

[3] 9 Commons' Journals, 244, 515.

[4] 3 Hallam, 32.   1 May's Const. Hist. (Am. ed.) 444.   May's Law of Parliament (7th ed.) 575.

[5] 3 Hatsell, 112, 113.                    [6] 3 Hatsell, 114–117, 120, 130.

ing of the subject." [1] In some instances, the Commons also asserted their exclusive privilege in cases of amendments authorizing the taking of fees, as "laying a charge upon the subject." [2] And the Commons afterwards applied the same rule to both penalties and fees, until it was found so inconvenient in practice, that it was relaxed in the present century by standing orders of the House. [3]

In the resolutions and proceedings of the two Houses of Parliament, the words "granting money" were applied to grants from the people through the Commons to the King; and such was the common meaning of the words in England. For instance, the elder Pitt (afterwards Lord Chatham), in the debate in the Commons in 1766, on the right of Parliament to tax the Colonies, said: "The taxes are a voluntary gift and grant of the Commons alone." "When, therefore, in this House we give and grant, we give and grant what is our own. But in an American tax what do we do? We, your Majesty's Commons of Great Britain, give and grant to your Majesty — what? Our own property? No. We give and grant to your Majesty the property of your Majesty's Commons of America." [4] So Mr. Burke, in his speech on Conciliation with America in 1775, spoke of the right to tax as "this privilege of granting money." [5]

The right asserted by the House of Commons, in the resolution of 1678, is that of granting aids and supplies to the King, and of originating bills for such grants, and of specifying in such bills the objects to which, and the modes in which, the money granted by those bills shall be applied. But nothing is there said as to the right of the Lords, when money has been once granted by the Commons without specific appropriation, to originate or to amend a bill appropriating it to particular uses or purposes. As observed by Mr. Hargrave in a paper prepared in 1784 "Concerning the Appropriation of Parliamentary Aids and Supplies for Particular Services," "In the more ancient times the usual course of Parliament on granting taxes and aids to the Crown

---

[1] 11 Commons' Journals, 728, 739.    3 Hatsell, 117.

[2] 3 Hatsell, 115, & note (1692); 124, note (1742).

[3] May's Law of Parliament, 579, 580.    Report of Select Committee on Tax Bills, 1860, pp. xii, xiii; appendix, p. 87.

[4] 16 Parl. Hist. 99.            [5] 2 Burke's Works (Am. ed. 1839) 33.

was to leave the application of the money wholly to the discretion of the King and his ministers; for though the occasion of the grant, as for enabling the King to defend the sea, or to carry on some war, was frequently mentioned, yet there was nothing like an appropriation of the tax to any particular purpose, the act granting the supply being usually silent as to the manner of expending it." In early times there were few exceptions to this practice. In the instance in the reign of James I., already mentioned, the restriction was inserted in accordance with a suggestion of the King. The despotic tendencies of Charles I. and the licentious extravagance of Charles II. induced the Commons to insert clauses of appropriation in some of the supply bills passed during their reigns. After the Revolution of 1688, the grant of supplies with appropriation to certain services became the common practice, and from 1698 it has been usual to pass a general appropriation act at each session of Parliament.[1]

By standing orders of the House of Commons, passed early in the last century, and by the construction given to those orders by the House, the supplies could only be granted upon recommendation from the Crown; and all sums so granted, whether for the use of the government or for private purposes, were considered as grants from the people to the Crown. The usual form of proceeding was, that the amount and the general purposes of the grant were fixed by the committee of supply, and the manner of raising it was determined by the committee of ways and means; and, when these two committees were closed, the House passed a general appropriation act.[2] Bills for appropriating out of the Treasury money already therein were, therefore, comparatively rare; and the copious collections of precedents in Mr. Hatsell's work, and in the Report of the Select Committee of the Commons, on Tax Bills in 1860, contain few cases before the American Revolution, in which special appropriation bills, originating or amended in the House of Lords, were objected to by the House of Commons as infringing upon their privileges. The principal ones are as follows:

---

[1] 1 Hargrave's Juridical Arguments, 394–402. 3 Hatsell, 175–181. 2 Hallam, 356–358. 3 Hallam, 115–117.

[2] 3 Hatsell, 173–178.

In 1691, at a conference between the two Houses of Parliament upon a bill for appointing commissioners to state the public accounts, the Commons resolve that the "disposition as well as granting money by act of Parliament hath ever been in the House of Commons." But the House of Lords "cannot allow the disposition, as well as granting, of money by act of Parliament, to have been solely in the House of Commons." And the bill was lost by disagreement between the two Houses.[1] A like controversy, with like result, took place in 1702.[2]

In 1696 amendments of the Lords to a bill of the Commons for remedying the ill state of the coin were rejected by the Commons, because the amendments, "being in order to give a longer time to receivers and collectors of the taxes and revenues to pay into his Majesty's Exchequer such hammered money as is mentioned in the bill, by tale, will give an opportunity to the said receivers and collectors to make great advantages to themselves, without any ease to the people, and will increase the deficiencies which are to be supplied at the public charge ; for which reason alone, the Commons can by no means admit that the Lords could make any amendment to this bill, which is to be a charge upon the people as aforesaid." And the Lords did not insist on their amendments.[3]

In the same year the Commons sent a message to the Lords to put them in mind that a bill for encouraging the bringing in of wrought plate to be coined belonged to the House of Commons, to be presented by their Speaker to the King, and to desire that it might be sent down to them, " for that the same allowed 5s. 4d. per ounce to be given for plate to be brought into the mints to be coined; and authorized the Commissioners of the Treasury to take £50,000 out of any moneys lent or advanced into the Exchequer, for the paying for such plate." But " the bill being brought by the clerk of the House of Lords to the clerk of this House, as bills relating to money usually are, the message was not sent."[4]

---

[1] 10 Commons' Journals, 646, 654, 669.   3 Hatsell, 115, 435, 438, 451

[2] 13 Commons' Journals, 899, 903.   3 Hatsell, 119.

[3] 11 Commons' Journals, 606, 607.   3 Hatsell, 116.

[4] 11 Commons' Journals, 732.   3 Hatsell, 144.

In 1708 the Commons disagreed to an amendment made by the Lords to a bill for covering the cupola of St. Paul's Church in London with copper, which the Lords proposed should be covered with lead. In the reasons given, the Commons, after arguing at some length the practical superiority of copper over lead, added, " The Commons cannot but take notice that the money for building the said cathedral was granted by the Commons, and therefore the application thereof does belong to them." The bill was lost by prorogation of Parliament.[1]

In 1719 an amendment by the Lords of a bill to prevent smuggling was disagreed to by the Commons as being " a disposition of public money," and another as being " an alteration of the Commons' disposition of public money," " contrary to the undoubted right of the Commons, and from which they can never depart." After a conference, the Lords did not insist on their amendments, the precise nature of which does not appear.[2]

In 1733 a bill from the Lords, for vesting in Sir Theodore Janssen the remainder of an estate " now in the Crown," was unanimously rejected by the Commons; but no reasons are stated.[3]

In 1736 the Lords amended a bill for indemnifying persons guilty of offences against the laws made for securing the revenues of customs and excise. Upon the amendment being read in the Commons, Mr. Speaker Onslow submitted to the House the question whether this was not an encroachment upon their privileges, and observed, " that, in all bills by which any tax or duty was to be imposed upon the subject, it was the undoubted privilege of that House, and they had always insisted upon it, that the other House should not make any the least amendment to any such bill, but were in all such cases either to pass the bill without any amendment, or to reject it if they thought fit; that, as the taxes and duties granted by that House could not be raised or collected without prescribing proper and effectual methods for that purpose, therefore in all bills for imposing any tax or duty upon the subject, certain methods had been prescribed for effectually raising that tax or duty; and if the methods prescribed

[1] 15 Commons' Journals, 649. 3 Hatsell, 122.

[2] 19 Commons' Journals, 142–144. 3 Hatsell, 122.

[3] 22 Commons' Journals, 138. 3 Hatsell, 124.

should afterwards by experience be found ineffectual, new methods had always been contrived, and proper bills passed for establishing those new methods; which last sort of bills had generally been looked on as appendixes to the first bill by which the tax or duty was granted; therefore such bills were looked upon as bills of the same nature with the first, and consequently that House had generally insisted upon it, that the other House could not make any amendment to this last sort of bills, no more than they could have done to the bill by which the tax or duty was granted." But the House, upon examination of precedents, agreed to the amendment.[1]

Mr. Hatsell, who wrote at the close of the American Revolution, and whose work has ever since been considered a standard authority for the claims of the Commons up to that time, in his chapter upon "Proceedings between Lords and Commons where the Rights and Privileges of either House are concerned," says: "Each House has a right to originate and to pass such bills as to them may seem proper, except that the Lords have, as appears from several of the instances, claimed the exclusive right that bills for restitution of honors, or in blood, should commence with them; and the House of Commons have on their part asserted, and I believe invariably preserved, the exclusive exercise of the right, 'that bills of supply, imposing burthens upon the people, should be the grant of the Commons, and that the Lords should have no other voice than, as one branch of the Legislature, by their assent to give the authority of a law to the levying of those aids and taxes which the Commons shall think wise and fitting to impose.' Other bills of what kind soever, whether relating to the Parliament itself, or to either House separately, may have their commencement indifferently in either House," with the single exception of a bill for a general pardon, which begins neither with the Lords nor with the Commons, but with the Crown.[2]

He here distinctly states that the only bills which must originate in the House of Commons are "bills of supply imposing burthens upon the people." So when he comes to deal more

---

[1] 3 Hatsell, 125.   9 Chandler's Debates, 236*.   9 Parl. Hist. 1268.   22 Commons' Journals, 717.

[2] 3 Hatsell, 62, 63.

particularly with what the House of Commons "have always considered as their exclusive right, viz. the grant of aids and taxes to the Crown for the public service," he speaks of it as applying to bills, "which either in the form of positive taxes or pecuniary penalties, or in any other shape, might by construction be considered as imposing burthens upon the people;"[1] and afterwards says, that, according to his observation, "the following propositions contain very nearly everything which has at any time been claimed by the Commons upon this subject :

"First, That in bills of aid and supply, as the Lords cannot begin them, so they cannot make any alterations, either as to the quantum of the rate, or the disposition of it, or, indeed, any amendment whatsoever, except in correcting verbal or literal mistakes; and even these the House of Commons direct to be entered specially in their journals, that the nature of the amendments may appear, and that no argument prejudicial to their privileges may be hereafter drawn from their having agreed to such amendments.

"Secondly, That in bills which are not for the special grant of supply, but which, however, impose pecuniary burthens upon the people, such as bills for turnpike roads, for navigations, for paving, for managing the poor, &c., for which purposes tolls and rates must be collected — in these, though the Lords may make amendments, these amendments must not make any alteration in the quantum of the toll or rate, in the disposition or duration of it, or in the persons, commissioners or collectors appointed to manage it. In all the other parts and clauses of these bills, not relative to any of these matters, the Commons have not objected to the Lords making alterations or amendments.

"Thirdly, Where the bill, or the amendments made by the Lords, appear to be of a nature, which, though not immediately, yet in their consequences, will bring a charge upon the people, the Commons have denied the right of the Lords to make such amendments, and the Lords have acquiesced.

"And, lastly, the Commons assert that the Lords have no right to insert in a bill pecuniary penalties or forfeitures, or to alter the application or distribution of the pecuniary penalties or forfeitures which have been inserted by the Commons.

---

[1] 3 Hatsell. 132.

" These rules with respect to the passing or amending of bills are clear, distinct, and easy to be understood and applied in all the cases which may occur. It has been sometimes attempted to extend this claim on the part of the Commons still farther; or, rather, so to construe the claim as to tend very much to embarrass the proceedings of the House of Lords upon bills sent from the Commons. This has never appeared to me a prudent measure. I think the House of Commons may rest satisfied with the observance of these rules, which they can maintain upon the ground of ancient practice and admitted precedents. Their sole and exclusive right of beginning all aids and charges upon the people, and not suffering any alterations to be made by the Lords, is sufficiently guarded by the claims as here expressed; and it does not seem to be either for their honor or advantage to push this matter farther, and, by asserting privileges which may be subjects of doubt and discussion, thereby to weaken their claim to those clear and indubitable rights which are vested in them by the Constitution, and have been confirmed to them by the constant and uniform practice of Parliament." [1]

The first and second of these classes include no bills that do not directly impose a pecuniary burden upon the people. The last class, that of bills imposing pecuniary penalties or forfeitures, stands only on the claim of the Commons, that these are burdens upon the people. The third class does not go beyond bills which " in their consequences " will impose a like charge, that is to say, by the effect of the bills themselves; and if construed as including bills which neither directly nor indirectly impose a burden upon the people, further than any bill authorizing the payment of money out of the Treasury may leave less money in the Treasury for the future needs of the government, is inconsistent with Mr. Hatsell's own statement previously quoted, and is supported, as we have seen, by few and inconclusive precedents.

In the debate in the Commons in 1783 on the Lords' amendment to the American Intercourse Bill, the Speaker observed, that, " as the bill empowered the Crown to impose duties, it was, strictly speaking, a money bill, and therefore the House could

---

[1] 3 Hatsell, 138–140. The references to this volume of Hatsell throughout this opinion are to the second English edition, which is the earliest accessible.

not, consistently with its own orders, suffer the Lords to make any amendment in it." Mr. Pitt "agreed that the bill was a money bill, and that, having been amended by the Lords, it ought to be rejected;" and Mr. Fox said that "he was willing that the amended bill should be rejected, though he was of opinion that the order of the House respecting money bills was often too strictly construed." [1]

In 1784 the House of Commons passed a resolution, declaring, that for any person in the Treasury or Exchequer, or employed in the payment of the public money, to issue, after a dissolution or prorogation of Parliament, money voted by Parliament for any services, and before the passage of any act of Parliament appropriating the supplies to such services, would be a high crime and misdemeanor, derogatory to the fundamental privileges of Parliament, and subversive of the Constitution of the country. But large supplies were afterwards voted, and not appropriated, before the dissolution of the same Parliament; and the next Parliament, supporting the ministers of the Crown, revoted the same supplies without question, although, in the interval, a portion of them had been expended by the ministers, without any parliamentary appropriation.[2]

Mr. Hallam distinctly says that the Lords have never acknowledged any further privilege in the Commons than that of originating bills of supply.[3] And Sir Erskine May observes, that "in cases where amendments have affected charges upon the people incidentally only, and have not been made with that object, they have been agreed to;" and that, until a very recent period, "the Commons accepted provisions in bills from the Lords, creating charges not directly imposed by the bill, but to be defrayed out of moneys to be provided by Parliament." [4]

The result of the review of this branch of the subject is, that it cannot be considered to have been settled in England before 1780, when the Constitution of the Commonwealth of Massachusetts was adopted, that the appropriation, to particular objects, of moneys in the Treasury or Exchequer of the Sovereign, be-

---

[1] 23 Parl. Hist. 895.   3 Hatsell, 129.

[2] 39 Commons' Journals, 858.   3 Hatsell, 83, 184.   1 May's Const. Hist. 72-81.

[3] 3 Hallam, 32.          [4] May's Law of Parliament, 576, 578.

longed exclusively to the House of Commons, and that bills for such appropriation must originate in that House.

The next matter to be considered, and quite as important a one in its bearing upon the true construction of our Constitution, is the comparative powers and privileges of the two branches of the Legislature of the Colony and Province of Massachusetts Bay. In dealing with this, it is to be borne in mind, that, according to the opinions of two of the very greatest constitutional lawyers of England, the House of Representatives in any of the subordinate legislative assemblies of the British dominions was not entitled to the privileges claimed and exercised by the House of Commons in Parliament.

In 1698 a bill for encouraging the linen manufacture in Ireland, having been framed by the Privy Council in England, and transmitted to the Irish Parliament, was there objected to as asserting the King's prerogative, and as invading the privileges of the Irish House of Commons. Lord Somers (then Lord Chancellor of England, and acting as a Lord Justice of the kingdom during the absence of the King in Holland), upon being informed of this by a letter from the Duke of Shrewsbury, Secretary of State, answered as follows : " The bill imposes some pecuniary penalties indeed, which of late the House of Commons in England, in their disputes with the Lords, call a money bill; but surely the Commons in Ireland did never think of carrying their sole right so far. It does also empower the grand juries in the several counties to assess a sum for building workhouses. If that would make it a money bill, there were many money bills passed in England last winter ; but there is not anything granted to the King by the bill." [1]

Lord Camden, when Attorney General, gave an opinion upon the several powers of the Council and Assembly of the Province of Maryland, as follows: " As to the power of the Upper House to examine claims and accounts, the Upper House are right in making a stand to this clause in the bill, and should take care how they admit encroachments of this kind, when they are supported by arguments drawn from the exercise of the like rights in the House of Commons here. The constitutions of the two

---

[1] 2 Hardwicke Papers, 434.

assemblies differ fundamentally in many respects. Our House of Commons stands upon its own laws, the *lex parliamentaria;* whereas assemblies in the Colonies are regulated by their respective charters, usages, and the common law of England, and will never be allowed to assume those privileges which the House of Commons are entitled to justly here, upon principles that neither can nor must be applied to the assemblies of the Colonies." [1]

At the first settlement of the Massachusetts Colony the Governor and Assistants, chosen annually by the freemen at a General Court under the Colony Charter of 1628,[2] levied taxes, in such proportions as they thought just, upon " the several plantations " for public purposes.[3] In 1632 the leading inhabitants of Watertown, so taxed for fortifying Newtown, objected " that it was not safe to pay moneys after that sort, for fear of bringing themselves and posterity into bondage." But upon being summoned before Governor Winthrop and · the Assistants, and " understanding· that this government was in the nature of a parliament, and that no assistant could be chosen but by the freemen, who had. power likewise to remove the assistants, and put in others," they " were. fully satisfied." [4] In 1634 it was enacted " that none but the General Court hath power to raise moneys and taxes ; " and the freemen of each town were authorized to choose deputies to the General Court for matters of legislation.[5] The order of 1644, separating the magistrates and deputies into two houses, allowed the magistrates to draw up any " bills and orders which they shall see good in their wisdom," and, having agreed upon them, to present them to the deputies for their assent or dissent; [6] and we are not aware of any question of privilege between the magistrates and the deputies in this regard while the Colony Charter lasted.

By the Province Charter of 1692, " a Great and General Court or Assembly " was established, to consist of the Governor appointed by the Crown, and twenty-eight councillors chosen annually by the General Court, subject to the Governor's nega-

---

[1] 1 Chalmers Opinions, 263.    [2] 1 Mass. Col. Rec. 12.
[3] 1 Mass. Col. Rec. 77, 82, 89, 93.
[4] 1 Winthrop's Hist. New England, 70.
[5] 1 Mass. Col. Rec. 117, 118.    [6] 2 Mass. Col. Rec. 58.

tive, and of representatives chosen annually by the inhabitants of each town; and it was declared that the General Court should have full power and authority, among other things, " to impose and levy proportionable and reasonable assessments, rates and taxes, upon the estates and persons of all and every the proprietors and inhabitants of our said Province or territory, to be issued and disposed of by warrant under the hand of the Governor of our said Province for the time being, with the advice and consent of the Council, for our service in the necessary defence and support of our government of our said Province or territory, and the protection and preservation of the inhabitants there, according to such acts as are or shall be in force within our said Province." [1]

In 1694 an unsuccessful attempt was made to secure to the House of Representatives all the rights of the House of Commons. The General Court passed an act declaring " that the House of Representatives of the people of this Province, being a part of the Great and General Court or Assembly, have, by their Majesties' most gracious Charter, undoubted right to all the liberties and privileges of an English assembly ; " " and that, when and so often as any motion is made to the House of Representatives for the granting of any money to be levied of the people of this Province, the said House of Representatives ought particularly to be advised what uses and improvement such money is to be raised for ; " " and that no public money be or ought to be disposed of by his Excellency the Governor and Council, but for the uses and intents of and according to the acts by which the said money is raised." But this act was disallowed by the King in Council. [2]

The resolve sent up by the House of Representatives with the tax bills in 1703, declaring, " that it is the undoubted privilege of this House that their concurrence be had in the particular application and disposal of all and every sum and sums that are put into the Treasury, so far as it can be practised," [3] asserts only the necessity of the concurrence of the House, and says nothing of an exclusive right to originate appropriation bills.

---

[1] 1 Prov. Laws (State ed.) 11, 12, 16, 17.
[2] 1 Prov. Laws, 170, & note.
[3] General Court Records, July 23, 1703.

The right of the House to originate all acts and orders for raising moneys from the people, and therein to appropriate such moneys to such services as they thought proper, was generally admitted.[1] But the House did not in practice construe this right so largely as the House of Commons in England.

Among the precedents transmitted to us is an order of the Council, concurred by the House, in 1750, directing that certain pieces of silver in the Treasury, being of a baser alloy than dollars, be not paid out by the Treasurer in any payments whatsoever, but be retained in the Treasury for the further order and disposal of the General Court.[2] Resolves for the assessment or collection of local taxes often originated in the Council, and were concurred in by the House without objection.[3] And acts for establishing or continuing the fees of officers appear to have originated and been amended indifferently in either House. In 1765 amendments of the Council to such a bill originating in the House were considered by a committee of conference between the two Houses, and ultimately concurred in with further amendments by the House;[4] and in 1770 a like bill originated in the Council, and was concurred in by the House, "saving to this House their privilege of originating all money bills;"[5] which sufficiently shows that such a bill was not considered a money bill, although it was intended to reserve the privileges of the House as to those that were.

In the early years of the Province, the House of Representatives claimed, as incidental to the right to originate supplies, the right to examine the accounts, before payment of any money under warrant of the Governor and Council; and before 1721 clauses to that effect were inserted in the supply bills. But

---

[1] 2 Hutchinson's Hist. Mass. (2d ed.) 294. Messages of the House and the Governor, September 18, 19, 1762, and of the House and Council, November 6, 1765, in General Court Records. Mass. State Papers, 1765–75 (ed. 1818) 52–56.

[2] General Court Records, February 14, 1750.

[3] General Court Records, January 12, 23, February 17, 1749; January 16, 22, April 22, June 13, December 31, 1760; January 16, 1761; June 7, November 6, 1764; January 17, 1765; January 9, 1768; June 24, 1771, and - April 17, 1772.

[4] General Court Records, February 23, 26, 1765.

[5] General Court Records, November 20, 1770; July 7, 1772.

this claim was afterwards resisted by the Governor, under in
structions from the King, and, after a prolonged controversy,
was finally put at rest by order of the King in Council, in accord-
ance with the opinion of the Attorney General (afterwards Lord
Hardwicke) and the Solicitor General (afterwards Lord Talbot),
as not warranted by the Province Charter; and it is said to have
been disapproved by the House of Commons.[1]

In 1730 amendments proposed by the Council, increasing the
sum allowed in a bill passed by the House for the support of the
Governor, were non-concurred by the House, and the two Houses
then held a conference upon the subject, at which the Governor
was present; and one of the amendments of the Council was
afterwards concurred by the House. Upon which Governor
Hutchinson observes, " This was a matter of money, which the
House sometimes refuse to confer upon; but they have been un-
steady in this respect." [2]

In 1753, the Council having amended a resolution of the House
requiring the Province Treasurer to give bond, the House sent
up a message, in which they said, " The Honorable Board cannot
but know that all grants of money and taxes must originate with
the House, and never till lately did the Honorable Board presume
to make alteration in any such grants or bills." To which the
Council replied: " The right of the House to originate all taxes
and grants of money has never been disputed by the Board.
But that the House have a right of making certain things neces-
sary to qualify a Province Treasurer, and that the Board are
held to agree to all or none of such qualifications, without the
liberty of making any amendment to the vote or resolve of the
House, is a position, which, until now, has never been laid down
by any House of Representatives since the Charter; nor can the
Board by any means concede to it." And the Council suggested
that the House should prepare a bill more fully and explicitly
settling the security to be required of the Treasurer. The House
prepared such a bill, which was by the Council " concurred, as
taken into a new draft," and then concurred by the House.[3]

---

[1] 2 Prov. Laws, 574, 701–703. 2 Hutchinson, 378. 4 Palfrey's Hist. New
England, 545.

[2] General Court Records, October 1–14, 1730. 2 Hutchinson, 373, & note.

[3] General Court Records, June 6–13, 1753.

On February 20, 1756, a vote of the House of Representatives, that there be allowed and paid the sum of £1,000 to Edmund Trowbridge, Jeremiah Gridley, and James Otis, Esquires, a committee previously appointed by the House to defend actions brought against their Speaker and messenger, and the keeper of the prison, by two persons imprisoned by order of the House for a supposed contempt, was, "In Council, Read and concurred, with amendments. In the House of Representatives, Read and unanimously non-concurred, and the House adhere to their own vote. In Council, Read and non-concurred." On February 21 a message was sent to the Council, in which "the House declare it to be their clear opinion that the grant of any money by this Court, to be raised by the people, must not only originate with the House in consequence of their representing the people, but that such grant cannot, in consequence of this their singular right, be anyways subject to the alteration of any other branch of the government, and that the amendment made yesterday by the Board in the said grant is a violation of the privileges of the House upon a vote made for the support of their privileges, which they are determined thoroughly to defend against all attempts and encroachments." The Council, in an answer sent down the same day, said: "Although the Board has been in the constant practice of lessening grants made by the Honorable House ever since the Charter, yet they do not design to enter into any dispute on this point at this time," "and are willing to come into any expedient that may preserve the rights of each House. The Board would have no exception to a vote effectually securing the payment out of the Public Treasury of every reasonable expense which may attend, or be the consequence of, the actions referred to; but they apprehend that many inconveniences may arise from the granting any determinate large sum for this purpose." On February 23 a new draft of the vote was sent up by the House, and non-concurred by the Council. "Andrew Oliver, Joseph Pynchon and Thomas Hutchinson, Esquires, were appointed a committee for the Council, to examine the books of the General Assembly for precedents of the Council's lessening grants of money, &c., and make report thereof at the next sitting of the Court." On the same day the Council, upon a message from the House desiring them to do so, reconsidered their vote of non-

concurrence, but, upon debate, again non-concurred.    On Febru
ary 24 the House sent up another message, insisting upon their
own form of vote, and stating that they had acted " entirely from
a persuasion that it is no more in the power of the Honorable
Board to lessen a sum of money granted by the House than to
make the grant or augment the sum; and, although the Honora-
ble Board have said that they have been in the constant practice
of lessening grants made by the House ever since the Charter, the
House consider this as a sudden assertion, and impossible to be
proved."    The records do not show any further action of the
Council, or that the committee appointed to search for precedents
ever made a report.    The reason may be, that, on February
26, the House passed a vote (to the effect originally suggested by
the Council) that the committee for the defence of the actions be-
fore mentioned " be from time to time paid, out of the Province
Treasury, such sums of money as shall be sufficient to enable
them properly to defend these actions; " and this vote was con-
curred by the Council, and consented to by the Governor.[1]

At the same session, a vote of the House, allowing a certain
sum to the Treasurer, had been non-concurred by the Council as
not making adequate compensation to him, upon a report of a
committee of the Council, which stated, among other things, that
" the committee are very sensible that the Board have no right
to enlarge any grant made by the House." [2]    But in 1759, upon
a bill for raising soldiers, amendments proposed by the Council,
increasing the number of men to be raised and the bounty to be
paid them, were considered by the House; and, although they
were not adopted, no objection appears to have been taken to the
right of the Council to propose them.[3]

Among the precedents transmitted to us by order of the two
Houses are the remonstrance of the House of Representatives in
1759 against the issue, by the Council, of warrants on the Prov-
ince Treasurer for paying the expenses of the funeral of Lieuten-
ant-Governor Phipps, as " a misapplication of the public moneys,
and unwarrantable, and which proceedings the House do remon-
strate against as an infraction upon our Constitution; " and the

---

[1] General Court Records, February 20–26, 1756.
[2] General Court Records, February 3, 6, 1756.
[3] General Court Records, April 17, 1759.

answer of the Council, justifying their action as in accordance with usage, and declining " at this time to enter into any dispute with the Honorable House with respect to the right of the Board to incur such small expenses, wherein they think the honor of the government concerned." [1]   But this, like other controversies between the House of Representatives and the Governor and Council as to the right of the latter, in their executive capacity, to draw money out of the Treasury, appears to us to have no direct bearing on the question of privilege between the House and the Council acting as the two branches of the Legislature.

In 1760, the Treasurer's accounts for a previous year having been examined by a committee of each House respectively, the committee of the House of Representatives made their report to the House, which, by vote, accepted the same, and resolved that the Treasurer be discharged of several sums, and accountable for several other sums therein mentioned.  The Council concurred in the vote, amending it, however, by striking out the preliminary words as to the acceptance of the report of the committee of the House, because, as they said in a message to the House, the Treasurer could be discharged only by act or order of the whole Legislature, and the Council chose " to see with their own eyes, and not with the eyes of the committees of the House." [2]

The House non-concurred in the amendment, and, in a message to the Council, said: " The House are sensible that an act or order of the whole General Court is requisite for the Treasurer's discharge; but the practice lately gone into by the Honorable Board, of a special examination of the Treasurer's accounts, is novel, and not within the rights belonging to them, either as the King's Council or as one branch of the Legislature.  The House challenge as their special rights and privileges the sole modelling all laws for imposing taxes upon the people for the defence and support of government, also have power to inquire into and judge of the uses and occasions for which moneys are demanded or given, and to appropriate the same, and to inquire into the applications, and to censure the misapplications thereof;

---

[1] General Court Records, February 8, 1759.
[2] General Court Records, January 3-16, 1760.

and by the British Constitution these poweis and privileges are hereditary to the representatives of the people. And the House apprehend that the Honorable Board have no right in those cases to amend the doings of the House, but absolutely to assent to or dissent from them. The Honorable Board cannot but be sensible, that, in all bills for levying money, the House have challenged and preserved their right of the sole modelling the same. There is the same reason they should have the like power of inquiring into the applications of the moneys raised upon the people. The House know no other proper method of their making such an inquiry but by a committee of their own, and consequently no proper method of their passing the Treasurer's accounts but by an acceptance of the report of such a committee, and passing a resolve thereon."[1]

The Council, in their reply, cautiously avoided admitting or denying, as not being involved in the question at issue, either the claim of the House to the exclusive right of appropriating moneys, or the assertion of the House that the Council had no right of amendment, saying: "The House seem to have mistaken the intention of the Board. The exception which the Board take to the vote of the House relates merely to the form of it. In answer to this exception, the House urge their right to originate and frame all laws for imposing taxes, to judge of the uses for which all moneys are granted, and to appropriate all such moneys as they think fit. The board deny none of these things; but they are all entirely out of the question. The House go on to say that they have a right of inquiry into the application of all public moneys, and that, in all those cases mentioned, the Board have no right to make any amendments upon the votes of the House. That the House have a right to make such inquiry the Board do not deny; that the Board have no right to amend any votes of the House in any of these cases will be conceded to or denied when there is occasion to determine this point. At present there is none; for the vote of the House, which is the subject of the present dispute, cannot respect such an inquiry as the House claim a right to, any more than it respects the other matters mentioned by the House. The application of the public

---

[1] General Court Records, January 16, 17, 1760.

moneys is made by his Excellency the Governor, with the advice and consent of the Council. The House surely will not send a vote respecting an inquiry into such application to the Board for their concurrence. The examination of the Treasurer's accounts, and an inquiry how far he has discharged himself, is quite a distinct thing from the other inquiry."[1]

The House afterwards passed a vote exactly like the former one, except in omitting the clause objected to by the Council, and inserting a recital that the Treasurer's account had not been accepted, "by reason of some disagreement between the two Houses in point of form, which may be attended with great inconvenience to the Province, if not timely prevented." And in this vote the Council concurred.[2]

In the same year, an order of the Council, accepting the report of a committee, farming out an excise for the county of Dukes County, for the year 1759, to Wilmot Wass, for a certain sum, and taking his bond with sureties to the Province Treasurer, was non-concurred by the House, solely because "the committee have not exhibited an account of charge on this affair, as has been usual in the like cases."[3] And in 1761, an order for the compensation of the sutlers of certain regiments originated and was passed in the Council, and, being non-concurred by the House, was referred to a joint committee, whose report was made to the Council, and there accepted, and afterward concurred by the House and consented to by the Governor.[4]

In January 1765 a resolve of the House, concerning the form of drawing moneys by the Province Treasurer out of the hands of the agent of the Province in England, was in the Council "concurred, taken in a new draft." The House objected, solely because the draft of the Council was headed "House of Representatives;" and in a message to the Council, said: "The Honorable Board have an undoubted right in all cases (except those of grants and money bills) to bring any vote or bill sent up from the House into a new draft. But then such new draft should be

---

[1] General Court Records, January 30, 1760.
[2] General Court Records, June 20, 1760.
[3] House Journal, February 7, 1760.
[4] General Court Records, March 27, April 7, 1761.

made the aot of, and passed upon by, the Honorable Board before it is sent down."[1]

In March 1765, in a message to the House, remonstrating against their having, without joining the Council, and after the Council had non-concurred a vote of the same import, published a notice to all officers and soldiers desiring of grants of land for actual settlement, to give in their names to a committee of the House, the Council observed, " That the House have considered their right to originate grants of land as similar to their right of originating grants of money is allowed;" but no exclusive privilege of the House as to either was admitted by the Council, or claimed in the messages of the House.[2]

Governor Hutchinson, in his History, writing of the same period, says : " It was a rule in joint committees, when the subject of consideration related to taxes, for the chairman to offer the report in Council, where it was read, and sent down to the House to originate a vote. In all other cases, the Council originated a vote upon the report, and sent the vote to the House, with the report, for concurrence." [3]  He also says : " Though both Houses professed to pay great regard to forms of proceeding in Parliament, they were not strictly adhered to. After a vote, or even a bill, had passed both Houses, the Governor would sometimes decline his assent in the form it had passed, and propose amendments or alterations, and they have been agreed to ; which is not warranted by the practice of Parliament." [4]

As the controversy between England and the Colonies upon the right of taxation grew more earnest, the House of Representatives of the Province sometimes asserted, and ultimately the Council in practice seemed to recognize, a more extensive privilege in the immediate representatives of the people. For instance, the House of Representatives, in a message to the Governor in 1767, contended that the clause in the Province Charter, which provided that the Governor and Council should have authority to issue money out of the Treasury only according to such acts as were or should be in force within the Prov-

---

[1] General Court Records, January 28, 30, February 7, 1765.
[2] General Court Records, June 17, 1764; March 8, 9, 1765.
[3] 3 Hutchinson, 113, note.        [4] 3 Hutchinson, 90, note.

ince, "was intended to secure to the House of Representatives the privilege of originating, granting, and disposing of taxes;"[1] and the Council at different times, from 1771 to 1774, by messages to the House of Representatives, suggested to them to take into consideration the services of the agent of the Province in England, and to make him an allowance therefor.[2] But occasional precedents, at a time when the colonists were using every possible argument to maintain their liberties against the Crown and Parliament of England and the Governor appointed by the King, are by no means conclusive evidence of the legitimate privileges of the two branches of the General Court of the Province.

We have been led to state such precedents under the Provincial government as were known to us, having any connection with the subject, at the greater length, because many of them exist only in manuscript or in very rare pamphlets, and because, if they had proved a consistent, uninterrupted and uncontested usage for a long course of years, they might have colored the meaning of the language of the Constitution adopted at the Revolution. But, so far as we can judge from the means at our command, the precedents of the time of the Province fall far short of proving that the House of Representatives habitually exercised in Massachusetts the privileges claimed by the House of Commons in England, or that it was a settled doctrine that a bill appropriating money from the Province Treasury, and not, in terms or effect, imposing any tax upon the people, must originate in the House of Representatives.

We are then brought to a consideration of the question of the meaning of the words "money bills," as understood at the time of the adoption of the Constitution of the Commonwealth, and in which they must be presumed to have been used by the framers of that instrument. Upon this point the evidence appears to us to be satisfactory and conclusive.

The bill of 1660, called on the Journal of the Commons[3] "a bill concerning money," and that of 1678, called in the contem-

---

[1] General Court Records, February 4, 1767. Mass. State Papers, 106.

[2] General Court Records, July 3, 1771; July 14, 1772; March 4, 1773; June 10, 1774.

[3] 8 Commons' Journals, 102.

poraneous notes of a member[1] "The Grand Money Bill," as well as the earlier bill of 1640, to which the term "money bill" is applied in Acherley's Britannic Constitution,[2] published in 1727, were ordinary bills of supply granting taxes upon the people. In the conference of 1671, when the Commons first denied the right of the Lords to amend a supply bill, the words "bills of money" were used in the reasons of the Commons, drawn by Sir Heneage Finch (afterwards Lord Chancellor Nottingham), as synonymous with "bill of impositions," which were the words used in the reasons offered by the Lords.[3]

In 1700, the first time, so far as we are aware, when the term "money bill" appears on the parliamentary journals, it is as equivalent to a bill for raising money. The Lords, in protesting against the tacking by the Commons, of a bill for applying certain forfeited estates to the use of the public, to a bill for granting an aid by a land tax, said: "The joining together in a money bill things so totally foreign to the methods of raising money, and to the quantity or qualification of the sums to be raised, is wholly destructive of the freedom of debates, dangerous to the privileges of the Lords and to the prerogative of the Crown; for by this means things of the last ill consequence to the nation may be brought into money bills, and yet neither the Lords nor the Crown be able to give their negative to them without hazarding the public peace and security."[4]

Lord Somers, in his letter to the Secretary of State in 1698, already quoted,[5] clearly manifested his opinion that nothing was a "money bill" that did not grant money to the King. And Lord Chancellor Hardwicke, in a debate in the House of Lords in 1741, on altering a turnpike bill from the Commons, said: "This is not a money bill. In a parliamentary sense they only are such, which grant money to the Crown."[6]

Sir William Blackstone, (of whose Commentaries, first published in 1765, nearly as many copies were said, ten years after-

---

[1] 6 Grey's Debates, 110.    4 Parl. Hist. 1005.
[2] Acherley's Britannic Constitution, 398.
[3] 9 Commons' Journals, 239, 243.    3 Hatsell, 372, 390.
[4] 16 Lords' Journals, 575.    3 Hatsell, 197.
[5] 2 Hardwicke Papers, 434.
[6] 12 Parl. Hist. 144.

wards, to have been sold in America as in England,[1]) after stating that "it is the ancient indisputable privilege and right of the House of Commons that all grants of subsidies or parliamentary aids do begin in their House, and are first bestowed by them," and observing that "herein they will not suffer the other House to exert any power but that of rejecting, they will not permit the least alteration or amendment to be made by the Lords to the mode of taxing the people by a money bill," adds this definition: "Under which appellation are included all bills by which money is directed to be raised upon the subject, for any purpose, or in any shape whatsoever; either for the exigencies of government, and collected from the kingdom in general, as the land tax; or for private benefit, and collected in any particular district, as by turnpikes, parish rates and the like."[2]

Although Blackstone differs from Lord Somers and Lord Hardwicke so far as to include a local tax, all three concur in excluding bills by which no tax whatever is raised, from the definition of money bills. And the most eminent constitutional historian of England agrees rather with Somers and Hardwicke than with Blackstone, and says, "I must confess, that when the wise and ancient maxim, that the Commons alone can empower the King to levy the people's money, was applied to a private bill for lighting and cleansing a certain town, or cutting dikes in a fen, to local and limited assessments for local benefit, (as to which the Crown has no manner of interest, nor has anything to do with the collection,) there was more disposition shown to make encroachments than to guard against those of others."[3]

Mr. Hallam, throughout his discussion of "money bills," treats it as their essential characteristic that they grant money from the people to the Crown.[4] And Sir Erskine May, in considering the Paper Duties Repeal Bill of 1860, says: "Nor was this strictly and in technical form a money bill. It neither granted any tax to the Crown, nor recited that the paper duty was repealed in consideration of other taxes imposed."[5]

The Constitution proposed by the General Court of Massachusetts, and rejected by the people in 1778, contained the following

---

[1] 2 Burke's Works, 36.   [2] 1 Bl. Com. 169, 170.
[3] 3 Hallam, 31, 32.   [4] 1 Hallam, 276.   3 Hallam, 27–32.
[5] 1 May's Const. Hist. 448.

article: " The Senate and House of Representatives shall be two separate and distinct bodies, each to appoint its own officers, and settle its own rules of proceedings; and each shall have an equal right to originate or reject any bill, resolve or order, or to propose amendments to the same, excepting bills and resolves levying and granting money or other property of the State, which shall originate in the House of Representatives only, and be concurred or non-concurred in whole by the Senate." [1]  The address of a convention of delegates held in the county of Essex in the spring of that year, opposing the adoption of that Constitution, (which address is commonly known as the Essex Result, and is understood to have been written by Theophilus Parsons, afterwards Chief Justice of Massachusetts,) describes that article thus: "Each branch hath a negative upon the other, and either branch may originate any bill, or propose any amendment, except a money bill, which should be concurred or non-concurred by the Senate in the whole." [2]  This passage has been sometimes cited as showing that that great lawyer considered money bills to include distinct bills appropriating money in the Treasury, as well as bills levying taxes.  But the words of the article are, not " bills and resolves levying or granting money or other property," but " levying and granting," which may fairly mean only bills of supply which both levy money upon the people and grant it to the government; and, notwithstanding the obscurity created by the addition of the words " of the State," the reasonable inference appears to be, that the money and property intended were those of the inhabitants as collectively constituting the State, and that the word " granting " was used, not, as it often is, to denote gifts from the government to individuals of the public money or lands, but in the same sense as in the English authorities before quoted, and by Mr. Parsons himself in the Convention which ratified the Federal Constitution in 1788, when he said, " The reason why the Lords have not this power" ("of proposing alterations or amendments in money bills") "is founded on a principle in the English Constitution, that the Commons alone represent the whole property of the nation; and, as a money bill is a grant to the King,

---

[1] Journal of Convention of 1779–80, appendix, 261.  Bradford's Hist. Mass. appendix, 471.

[2] Parsons's Life of Parsons, 48–51, 394.

none can make the grant but those who represent the property of the nation." [1] But if the article upon this subject in the rejected Constitution of 1778 should be considered of doubtful or different meaning, it can only be because of the words inserted therein, that are not repeated in the Constitution adopted in 1780 and which governs the question before us.

In the Convention of 1787 which framed the Constitution of the United States, after repeated attempts to confer upon the national House of Representatives the exclusive right of originating "bills for raising or appropriating money," [2] the provision upon the subject was finally adopted in this form, "All bills for raising revenue shall originate in the House of Representatives," with the additional clause, (taken from the Constitution of Massachusetts,) "but the Senate may propose or concur with amendments, as on other bills." [3]

According to many authorities of the greatest weight, the term "bills for raising revenue," as here used, is exactly equivalent to "money bills." In 1788, in the Convention of Massachusetts which ratified the Federal Constitution, Increase Sumner, then a Justice of the Supreme Judicial Court, and afterwards Governor of the Commonwealth, said that one security in the hands of the people under this Constitution was, that "all money bills are to originate with the House of Representatives." And Theophilus Parsons said, "Under this Constitution, an equal representation immediately from the people is introduced, who by their negative, and the exclusive right of originating money bills, have the power to control the Senate, where the sovereignty of the States is represented." [4] Both these eminent citizens had been members of the Convention that framed the Constitution of Massachusetts eight years before. A paper, written either by Mr. Hamilton or by Mr. Madison, in the Federalist, in the same year, speaks of "the equal authority which will subsist between the two Houses on all legislative subjects, except the originating of money bills." [5] James Wilson, also a member of the Conven-

---

[1] Debates in Massachusetts Convention of 1788 (ed. 1856) p. 193.
[2] Madison Papers, 1024, 1228, 1305, 1316, appendix, xvii.
[3] Madison Papers, 1531, 1609. Const. U. S. art. 1, sect. 7.
[4] Debates in Massachusetts Convention of 1788, pp. 163, 191.
[5] Federalist, No. 58. Introduction to Dawson's edition.

tion that framed the national Constitution, and one of the **first**
Justices of the Supreme Court of the United States, in his Lec-
tures on Law, delivered at Philadelphia in 1790 and 1791, repeat-
edly speaks of that Constitution as having directed that "money
bills shall originate in the House of Representatives." [1]    And
Mr. Justice Story, in his Commentaries on the Constitution,
speaks of " bills for raising revenue " as " what are technically
called 'money bills,'" and of the Constitution of the United
States as conferring on the House of Representatives " the ex-
clusive right to originate money bills." [2]

In the face of this accumulation of authorities, English and
American, the use of the words "money bills" in some recent
treatises,[3] as including appropriation bills, seems to us of little
value upon the question of the meaning of these words at the
time of the adoption of the Constitution of the Commonwealth.
But this is not all.

Questions of the construction of a Constitution which has been
long in force are not to be decided by a mere interpretation of
the language of the instrument, but are in a great degree his-
torical questions, upon which the practical exposition by those
branches of the government charged with the duties of adminis-
tration and legislation, especially if nearly contemporaneous with
the establishment of the Constitution, and followed and acqui-
esced in for a long period of years afterwards, is never to be
lightly disregarded, and is often conclusive.[4]   This rule of con-
struction has been frequently applied by the courts as a test of
the constitutionality of acts of the executive [5] or of the legisla-
tive department.[6]

---

[1] 1 Wilson's Works, 445.   2 Wilson's Works, 161.

[2] Story on the Constitution, §§ 871, 873.

[3] Cushing's Law and Practice of Legislative Assemblies, §§ 2304, 2361,
2369.   1 Todd's Parliamentary Government, 525.   Cox's Institutions of the
English Government, 198.

[4] 1 Kent Com. 465, & note.   Story on the Constitution, § 408.   Cooley
Const. Lim. 69.

[5] *Surgett* v. *Lapice*, 8 How. 48, 68.   *Commonwealth* v. *Lockwood*, 109 Mass.
323, 339.   *Commonwealth* v. *Costley*, 118 Mass. 1, 36.

[6] *Stuart* v. *Laird*, 1 Cranch, 299, 309.   *M'Culloch* v. *Maryland*, 4 Wheat.
316, 401.   *Portland Bank* v. *Apthorp*, 12 Mass. 252, 257.   *Commonwealth* v
*Parker*, 2 Pick. 550, 556.   *Holmes* v. *Hunt*, 122 Mass. 505, 516.

For instance, in a case in which it was contended that the judges of the federal courts had not been commissioned according to the Constitution, the Supreme Court of the United States said: " To this objection, which is of recent date, it is sufficient to observe, that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not now to be disturbed." [1] And in a case involving the validity of a tax act passed by the Legislature of the Commonwealth, Chief Justice Parker, delivering the judgment of the Supreme Judicial Court, said, " In questions touching the powers of government under a written Constitution, not affecting the essential rights of the citizen, the practice and usage of successive Legislatures, from the time the government began, when its powers, as well as the rights of the subject, were well understood, and when there was a general disposition to keep all the departments within their prescribed sphere, down to the present time, may furnish strong grounds for explanation of parts which are obscure, or not perfectly explicit." [2]

The Constitution of the Commonwealth contains the following provisions : " No subsidy, charge, tax, impost or duties ought to be established, fixed, laid or levied, under any pretext whatsoever, without the consent of the people, or their representatives in the Legislature." [3]  " The department of legislation shall be formed by two branches, a Senate and House of Representatives, each of which shall have a negative on the other. The legislative body shall be styled the General Court of Massachusetts." [4] " Full power and authority are hereby given and granted to the said General Court, from time to time," to make laws, to choose or provide for the choosing of civil officers, and set forth their duties and powers, " and to impose and levy proportional and reasonable assessments, rates and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the said Com-

---

[1] 1 Cranch, 309.

[2] 12 Mass. 257.

[3] Declaration of Rights, art. 23.

[4] Chap. 1, sect. 1, art. 1.

monwealth, and also to impose and levy reasonable duties and excises upon any produce, goods, wares, merchandise and com modities whatsoever, brought into, produced, manufactured or being within the same." "And while the public charges of government, or any part thereof, shall be assessed on polls and estates in the manner that has hitherto been practised; in order that such assessments may be made with equality, there shall be a valuation of estates within the Commonwealth, taken anew once in every ten years at least, and as much oftener as the General Court shall order."[1] "All money bills shall originate in the House of Representatives; but the Senate may propose or concur with amendments, as on other bills."[2]

In the opinions required by the two Houses, and delivered by the Justices of the Supreme Judicial Court in 1781, affirming the equal right of the Senate with the House of Representatives in examining and adjusting the lists of valuation returned from the several towns as a rule for their future conduct in making laws imposing public taxes, Chief Justice Cushing said, "I suppose a money bill to be a bill imposing a direct tax upon the people;" and each of his associates, more or less distinctly, concurred in that view. All these judges had been members of the Convention that framed the State Constitution the year before; and peculiar respect is due to the opinion, expressed in such a way as to show that it had not occurred to him there could be a doubt upon the matter, of Chief Justice Cushing, who was a member of the highest court of judicature of the Province and of the State from 1772 to 1789, and who was appointed by President Washington the first Associate Justice, and afterwards Chief Justice, of the Supreme Court of the United States, but declined the latter office. It is also to be noticed that he and his associates did not consider the usage under the English Constitution or the Royal Charter as controlling the construction of the Constitution of the Commonwealth, under which senators as well as representatives are elected directly by the people.[3]

The lists, transmitted to us by order of the two Houses,[4] of

---

[1] Chap. 1, sect. 1, art. 4.                [2] Chap. 1, sect. 3, art. 7.

[3] *Opinions of Justices, ante,* 547.        [4] Senate Doc. 1878, No. 253.

bills and resolves originating in the Senate within the first ten years after the establishment of the Constitution, include bills or resolves for levying duties and excises, regulating fees of public officers, abating taxes of particular towns, authorizing the Treasurer of the Commonwealth to borrow money and issue certificates therefor, establishing a mint, making appropriations for public purposes of moneys in the Treasury, and directing the payment of such moneys to delegates in Congress, members of the General Court and of the Council, civil officers, military officers and soldiers, and private individuals, besides a resolve granting a special tax to be levied on the polls and estates of the county of Middlesex for building a new jail, and bills or resolves for levying taxes on towns not incorporated, and which therefore, under the Constitution, were not then represented in the Legislature except in the Senate.[1]

This course of proceeding, at least as far as regards bills or resolves appropriating and directing the payment of money from the Treasury, was not established without early and thorough discussion of the question whether such bills or resolves were money bills within the meaning of the Constitution.

On June 5, 1783, a resolve, "granting £3 18s. 6d. to Samuel Hinckley in full for conveying letters from the Sheriff of Hampshire to the General Court," was passed by the Senate, and sent down for concurrence. The House non-concurred, and referred the account of Mr. Hinckley to a committee, and afterwards originated and sent up a like resolve. On June 13, according to an entry in the Senate Journal, "The question being put, whether it be the opinion of the Senate that a bill or resolve for granting money out of the public Treasury may originate in the Senate, — that clause in the Constitution, 'All money bills shall originate in the House of Representatives,' notwithstanding, — it passed in the affirmative, seventeen out of twenty." On June 20, both Houses appointed committees of conference upon the subject of the resolve, the chairman of the committee on the part of the House being Theodore Sedgwick, afterwards Speaker of the national House of Representatives, and a Justice of the Supreme Judicial Court of the Commonwealth. On July 4 this committee reported to the Senate as follows: "Consider-

---

[1] Chap. 1, sect. 2, art. 2; sect. 3, arts. 2, 3, 4.

ing the multiplicity and importance of the public business now before the General Court, necessary to be immediately attended to, and the near approach of a recess thereof, that, during the remainder of the present session of the General Court, all grants shall originate in the House of Representatives, but that the question of privilege and right shall not be considered as affected by this agreement, but shall be open for future discussion; and that this agreement shall be entered on the journals of both Houses." This report was amended by striking out the words "the House of Representatives," and inserting "either House," and in this form was sent to the House for concurrence. The House refused to concur, and the Legislature adjourned without further action on the subject. On September 24 the same Legislature met again, and on October 9 the House passed a resolve substantially like the original resolve of the Senate, in which the Senate non-concurred. On October 14, as is stated on the House journal, "The House took into consideration the right of the two branches of the Legislature to originate the grant of moneys, and the following was made a question; viz. 'Whether an order for the payment of any moneys for services, as done agreeably to an establishment by the General Court, can constitutionally originate in the Honorable Senate?' Which was voted in the affirmative, ninety-five members present, sixty-two yeas." On October 17, the House sent up a message to the Senate, requesting them to send down the account of Mr. Hinckley and the resolve of the Senate thereon; and, the same having been brought down, "the House reconsidered their respective votes of non-concurrence, and concurred with the original vote of the Senate, granting to the accountant £3 18s. 6d." And on the same day the resolve was approved by Governor Hancock. Samuel Adams was then President of the Senate; and he and twelve other senators, including the three members of the Senate committee of conference, had been members of the Convention that framed the Constitution of 1780; and in the House of Representatives, besides Theodore Sedgwick, were James Sullivan, Tristram Dalton, William Phillips, Rufus King, and Nathan Dane.[1]

---

[1] Senate and House Journals. 1783. President Pitman's Opinion, Senate Doc. 1869, No. 275, pp. 8–10

The smallness of the sum involved was evidently not thought to impair the weight of the precedent thus established; for the same rule was afterwards constantly followed by the two Houses, without question, upon resolves making large appropriations of money; and on March 11, 1785, the Senate entered on their journal the following declaration:

"Whereas His Honor the Lieutenant-Governor, on the twenty-second day of February last, in his message to the Honorable House of Representatives, laid before the said House a letter from the delegates of this Commonwealth in Congress, whereby information was received that the said delegates had drawn a bill of exchange on the Treasurer for two hundred and sixty Mexican dollars, in consequence whereof a resolve has passed the said House of Representatives to request the Governor, with the advice of the Council, to issue his warrant for the payment of the said sum, and directing the Treasurer to discharge the said draft, which resolve has this day been concurred; and whereas it is the undoubted and acknowledged privilege of the Senate, equally with the House of Representatives, to originate grants of money, by reason whereof the said message ought to have been directed to both branches of the Legislature, and as the silence of the Senate on the subject might be construed as a relinquishment of the privilege aforenamed: it is therefore hereby declared, that the privilege aforesaid is the undoubted right of the Senate, and that the proceedings aforesaid ought not to be, nor shall the same at any future time be, drawn into precedent. Ordered, that the above declaration be entered on the journal." [1]

We have not been furnished with any precedents later than 1790, and it is assumed in the carefully prepared opinions of the presiding officers of each House, which have been transmitted to us, that the right of originating bills appropriating money from the Treasury was habitually exercised by the Senate from 1783 to 1868. During that period two Conventions to revise and amend the Constitution of the Commonwealth were held, the one in 1820, the other in 1853; in neither of which, so far as we are informed, was the subject mentioned in any way, except that on May 17, 1853, an order was adopted to inquire into the expe-

---

[1] Senate Journal, 1785. Senate Doc. 1869, No. 275, pp. 10, 11.

diency of "so altering or amending the Constitution as to provide that all bills and resolves authorizing the expenditure of money or the payment of money from the Treasury of the Commonwealth shall originate in the House of Representatives;" and this order was referred to a committee, which, on May 31, reported that it was inexpedient to act thereon, and this report was accepted by the Convention.[1] The practice of bringing in general appropriation bills, first introduced in this Commonwealth by the Legislature of 1858,[2] did not, as is sufficiently shown by the list of acts and resolves of 1863 and 1864, appended to Mr. President Pitman's opinion,[3] interrupt the exercise by the Senate of the right to originate bills or resolves making special appropriations of money for particular purposes.

The conclusion appears to us inevitable, that the construction undoubtingly assumed by the Justices of the Supreme Judicial Court in advising the two Houses of the Legislature in 1781, and deliberately considered and determined by concurrent action of the Senate and House of Representatives two years later, and acquiesced in without further contest for eighty-five years afterwards, must be deemed to have been thereby established as the true construction of the Constitution.

This conclusion is fortified by considering the reason on which the privilege of the House of Commons rests, which is well stated by Blackstone, as follows: "The Lords, being a permanent hereditary body, created at pleasure by the King, are supposed more liable to be influenced by the Crown, and, when once influenced, to continue so, than the Commons, who are a temporary elective body, freely nominated by the people. It would therefore be extremely dangerous to give the Lords any power of framing new taxes for the subject: it is sufficient that they have a power of rejecting, if they think the Commons too lavish or improvident in their grants."[4] Such a reason has no force here.

Even in the Constitution of the United States, under which the senators are not elected by the people, but by the Legis-

---

[1] Documents of Convention of 1853, No. 21. 1 Debates in Convention of 1853, pp. 160, 425.

[2] Sts. 1858, cc. 1, 11.          [3] Senate Doc. 1869, No. 275, pp. 15, 22.

[4] 1 Bl. Com. 169.

latures of the several States, many leading members of the Federal Convention, ·such as Washington,[1] Madison,[2] Roger Sherman,[3] Oliver Ellsworth,[4] James Wilson,[5] and Gouverneur Morris,[6] thought it unwise to impose any restriction on the legislative power of the Senate. In this Commonwealth, where the senators, as well as the representatives, have always been chosen directly by the people, (although, under the Constitution as originally adopted, they were apportioned among the counties according to the proportion of the public taxes paid by each, while the representatives were distributed among the several towns according to the number of ratable polls,[7]) the people are amply protected against any danger of oppression, by the security from being compelled to pay any money towards the support of the government or the discharge of its obligations, otherwise than by an enactment originating in the House of Representatives. And since the amendments of the Constitution, adopted in 1855, by which the members of both Houses alike are elected by districts, according to the number of legal voters in each,[8] there is certainly no reason for enlarging the exclusive privilege of the House of Representatives beyond the limit before established.

The result is, that, having regard to the history of the subject, to the settled meaning of the words " money bills " at the time of the adoption of the Constitution of the Commonwealth, and to the contemporaneous construction of that Constitution by the Justices of the Supreme Judicial Court and by both Houses of the Legislature, affirmed by a continuous and uniform practice of eighty-five years, we are of opinion that the exclusive constitutional privilege of the House of Representatives to originate money bills is limited to bills that transfer money or property from the people to the State, and does not include bills that appropriate money from the Treasury of the Commonwealth to particular uses of the government, or bestow it upon individuals or corporations ; and

---

[1] Madison Papers, 1316, note.  [2] Ibid. 856, 1267, 1271.
[3] Ibid. 857.  [4] Ibid. 1271.
[5] Ibid. 1041, 1097, 1267, 1271, 1308.  [6] Ibid. 1043, 1266, 1272.
[7] Chap. 1, sect. 2, art. 1; sect. 3, art. 1.
[8] Amendments 21, 22.

Therefore, that the questions proposed by the Honorable Senate and the Honorable House of Representatives respectively must be answered as follows:

First. The Senate can, under the provisions of chapter 1, section 3, article 7, of the Constitution, originate a bill or resolve appropriating money from the Treasury of the Commonwealth.

Second. The Senate can, under those provisions, originate a bill or resolve involving directly or indirectly the expenditure of money from the Treasury, or imposing a burden or charge thereon.

Third. The power to originate a bill appropriating money from the State Treasury is not limited by the Constitution to the House of Representatives, but resides in both branches of the Legislature.

> HORACE GRAY.
> JAMES D. COLT.
> SETH AMES.
> MARCUS MORTON.
> WILLIAM C. ENDICOTT.
> OTIS P. LORD.
> AUGUSTUS L. SOULE.

Boston, December 31 1878