OPINION OF THE JUSTICES TO THE SENATE.

*Constitutional Law*, Public purpose, Expenditure of public money, Railroad, Credit of the Commonwealth, Money bill.

Payment of public money to The New York, New Haven and Hartford Railroad Company in consideration of the company's agreement to grant an option to the Commonwealth to purchase a portion of its lines from Boston to Braintree and further agreement to continue for a specified time its operation of passenger service over its lines to and from Boston and designated railway stations in Scituate, Plymouth, Falmouth, and Barnstable, in order to forestall imminent abandonment of passenger service on such lines by the company and to preserve valuable rail transportation and rail facilities, would be for a public purpose. [806–807]

A contract authorized by proposed legislation whereby, in consideration of certain promised acts by a railroad, the Commonwealth would agree to make certain payments to the railroad, one payment to be made by a city and the others through borrowing by the Commonwealth and assessment of the sums borrowed and borrowing charges on various municipalities, would not involve giving or loaning the credit of the Commonwealth within art. 62, § 1, of the Amendments to the Massachusetts Constitution. [807–808]

A "money bill" within the meaning of that term in c. 1, § 3, art. 7, of the Massachusetts Constitution is a bill primarily designed to raise revenue. [809–810]

Proposed legislation originating in the Senate authorizing an obligation of the Commonwealth to pay certain sums to a railroad in order to preserve passenger transportation and valuable rail facilities in a certain area, part of the money to be paid by a city and raised by local taxation therein under G. L. c. 59, § 23, and the rest to be raised by borrowing by the Commonwealth and assessment of the sums borrowed and borrowing charges upon certain municipalities under § 20, as amended, would not be a "money bill" which under c. 1, § 3, art. 7, of the Massachusetts Constitution must originate in the House of Representatives. [809–810]

On July 15, 1958, the Justices submitted the following answers to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit these answers to the questions set forth

in an order of the Senate dated July 8, 1958, and transmitted to us on July 10. The order refers to a bill pending before the Senate which has been amended from a bill printed in Senate No. 765, which is a report by the special commission to investigate and study the continuation of freight and passenger service by The New York, New Haven and Hartford Railroad Company, Boston and Maine Railroad, and Boston and Albany Railroad, and the relocation of the South Station Terminal. See c. 43 of the Resolves of 1958.

The title of the amended bill is "An act establishing the Old Colony Area Transportation Commission for the purpose of making a contract with the New York, New Haven and Hartford Railroad Company to continue passenger service until July first, nineteen hundred and fifty-nine on the Old Colony lines and extend an option to buy said lines."

The bill has the following preamble: "Whereas, The deferred operation of this act would tend to defeat its purpose, which is to avoid substantial loss of employment, great reduction in property values, other irreparable harm to the economic welfare of the southeastern part of the commonwealth and to the city of Boston and vehicular traffic congestion and other hardships in travelling which will ensue if, on July eighth in the current year, railroad passenger service into and out of the city of Boston upon the lines formerly owned by the Old Colony Railroad Company is discontinued pursuant to a certain plan of reorganization, therefore this act is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience."

We summarize the provisions of the bill. There is created until July 1, 1959, the Old Colony Area Transportation Commission, to consist of five persons appointed by the Governor with the advice and consent of the Council, one from Boston and four from certain cities and towns in the area, no two to be from the same municipality (§ 1). The commission is to enter into a contract in the name and behalf of the Commonwealth with The New York, New Haven and Hart-

ford Railroad Company whereby in consideration of an agreement by the Commonwealth to pay the railroad company $900,000 in four equal instalments of $225,000 each on October 1, 1958, and January 2, April 1, and July 1, 1959, the railroad company shall agree (1) to grant an option to the Commonwealth to purchase on or before August 15, 1959, a portion of certain lines in the area; and (2) to operate railroad passenger service until July 1, 1959. The option is to be upon that portion of the Boston group lines extending from Boston to Braintree, and the purchase is to be at the salvage value which was accepted and confirmed in 1945 by the United States District Court for the District of Connecticut in the bankruptcy proceedings for reorganization of the railroad company, plus the depreciated amount of subsequent capital improvements. The option is (a) to be limited to such facilities appurtenant to the Boston-Braintree segment as shall be reasonably required by the Commonwealth for its passenger operation and subject to a right in the railroad company to make joint use of such of those facilities as are not reasonably required for the exclusive use of the Commonwealth; and (b) to be accompanied by an undertaking by the railroad company to accord to the Commonwealth so far as possible, in the event it exercises such option, the right to use the Boston Terminal Company property on the same terms and conditions as enjoyed by the railroad company. The agreed passenger service is to be to and from Boston through the Atlantic station in Quincy to designated stations in Scituate, Plymouth, Falmouth, and Barnstable. The service is to be of the same type as, or of a type which in the judgment of the commission is better than, the service furnished on those lines during the year beginning July 1, 1957, and of a quality and with equipment at least as good as the service furnished during that year. The service is to be furnished on the same or more frequent operating schedules for each season for the designated stations and all intermediate stations as the service furnished during that year, and at tariffs in effect upon the passage of the proposed act (§ 2).

The commission has the duties of superintending for the Commonwealth the performance of the contract and of investigating complaints as to the railroad company's performance, and may refer complaints for advice to a board, established by the bill, known as Old Colony Area Transportation Advisory Council. Upon application of the Commonwealth acting by the Attorney General at the request of the commission, the Superior Court shall have jurisdiction in equity to compel specific performance of the contract by the railroad company (§ 2).

The first payment of $225,000 due on October 1, 1958, is to be made on or before that date by the city of Boston, the assessors of which shall include that sum in assessing taxes in the current year under G. L. c. 59, § 23. The three instalments payable in 1959, with interest or other charges incurred in borrowing money to pay those instalments, shall be assessed as provided in G. L. c. 59, § 20 (as amended through St. 1946, c. 432, § 1), upon thirty-seven municipalities in proportions set forth in a schedule. The State Treasurer is authorized to borrow to pay the instalments due in 1959 (§ 3).

The Old Colony Area Transportation Advisory Council is to exist until July 1, 1959, and is to consist of the mayor of each city and the chairman of the board of selectmen in each town whose votes shall be in proportion to the amount of payments, exclusive of interest or other charges, made under § 3. The council shall act only by the affirmative vote of two thirds of the total number of votes in the council (§ 4). The council shall make to the General Court recommendations as to the continuation after July 1, 1959, of commuter service between the Old Colony transportation area and Boston (§ 5).

The order contains these recitals:

"Whereas, Section 1 of Article LXII of the Amendments to the Constitution of Massachusetts provides as follows: —

" 'The credit of the commonwealth shall not in any manner be given or loaned to or in aid of any individual,

or of any private association, or of any corporation which is privately owned and managed.'; and

"Whereas, Under Article X of the Declaration of Rights, Article IV of Section 1 of Chapter I and other provisions of the Constitution of Massachusetts and under the Fourteenth Amendment to the Constitution of the United States public money may not be used except for a public service or a public use; and

"Whereas, Said bill as amended and changed originated in the Senate; and

"Whereas, Article VII, Section III, Chapter I of the Constitution of Massachusetts provides 'All money bills shall originate in the House of Representatives; but the Senate may propose or concur with amendments, as on other bills.'; and

"Whereas, Grave doubt exists as to the constitutionality of said amended bill if enacted into law."

The questions are:

"1. Would the payment of money by the commonwealth to the New York, New Haven and Hartford Railroad under the provisions of the contract described in said amended bill violate the provisions of said section 1 of Article LXII of the Constitution of Massachusetts?

"2. Would the payment of money by the commonwealth to the New York, New Haven and Hartford Railroad under the provisions of the contract described in said amended bill violate said provisions of the Constitution of Massachusetts or of the United States which prohibit the expenditure of public money except for a public service or a public use?

"3. Is said pending bill, as amended and changed, a money bill within the meaning of said Article VII, Section III, Chapter I of the Constitution of Massachusetts?"

The basic problem is raised by question 2, and is whether the proposed bill involves any constitutionally prohibited

expenditure of public money for other than a public service or a public use. The purpose of the bill, read as a whole, is to preserve within an important area of the Commonwealth valuable rail transportation and rail facilities. Under the bankruptcy reorganization plan of the railroad company service on the portion of the former Old Colony lines here involved could be abandoned in circumstances which it is not necessary to recite. See e.g. *New York, New Haven & Hartford R.R. Co. Reorganization*, 254 I. C. C. 63, 86–99; ibid., 405, 419–423; *In re New York, New Haven & Hartford R.R.* 54 F. Supp. 595, 610–618 (D. Conn.); 147 F. 2d 40, 51 (2d Cir.), cert. den. sub nom. *Massachusetts* v. *New York, New Haven & Hartford R.R.* 325 U. S. 884; 150 F. 2d 169 (2d Cir.). Under the reorganization plan also, in certain circumstances, which we need not set out, but which are referred to in the last paragraph of § 2 of the present bill, the Commonwealth was given an option to purchase certain parts of the Old Colony lines which might be of use in a permanent solution (see special commission's report) of "the difficult problem of providing transportation and reasonable access to Boston for the citizens of southeastern Massachusetts." An extension of this option, or the negotiation of a new option is a major feature of § 2 of the pending bill.

The report of the special commission shows (a) that on May 13, 1958, the railroad company gave notice of intention to abandon passenger service on the lines pursuant to its privilege under the reorganization plan, and (b) that on June 25 it was made apparent by the judge of United States District Court for the District of Connecticut exercising jurisdiction over the execution of the relevant provisions of the reorganization plan "that it was his intention to enter an order 'within the next three to five days' confirming the right of the New Haven . . . to abandon passenger service on the Old Colony lines and making permanent his injunction against the officials of the Commonwealth taking any steps in any other Court to interfere with such abandonment." It is a matter of common knowledge that pas-

senger service was in fact abandoned for one day on July 9, and that service now continues only by temporary arrangement with the railroad company to permit completion of the consideration of the present bill.

The abandonment of the passenger service is said in the report of the special commission to raise "a specter . . . of the isolation of an important part of the Commonwealth, where almost one-half million of our citizens reside, with its attendant disruption of the economic, social and family life of all of these people; of the terrible traffic and parking problems which would be created if the railroad commuters were forced to take private automobiles to Boston; of the impact on property values, both in the residential areas deprived of railroad service, and in the business area adjacent to Dewey Square in Boston; of the permanent loss of between 600 and 700 jobs of the railroad workers who would be involved; and of the many other consequences which would flow from an abandonment of the railroad passenger service."

It takes no extended discussion to establish that, in the critical situation already outlined, expenditures from public funds by the Commonwealth or its subdivisions to preserve public transportation of the type described are expenditures for a public purpose. See *Opinion of the Justices*, 261 Mass. 523, 541–544, dealing with expenditures affecting the Boston Elevated Railway Company, as to which this court said at page 542, "The transportation of the people at large in the district served by the . . . Railway system is a matter in which the public and the government as the representative of the people have an interest." For other opinions dealing with what constitute expenditures for public purposes, see *Boston* v. *Treasurer & Recr. Gen.* 237 Mass. 403, 413–414, and cases cited (operation of Boston Elevated Railway Company properties "for the general welfare"); *Opinion of the Justices*, 320 Mass. 773, 775–776, 780–781 (veterans' housing); *Opinion of the Justices*, 322 Mass. 745, 749–750, 753 (veterans' housing); *Opinion of the Justices*, 334 Mass. 721, 741 (port authority). See also *McLean* v. *Boston*,

327 Mass. 118, 120–122; *Opinion of the Justices, ante,* 777, 781, 784. Compare *Gloucester Ice & Cold Storage Co.* v. *Assessors of Gloucester, ante,* 23, 26–27.

Question 2 must be answered, "No."

We next consider question 1, which is whether the proposed bill involves any violation of § 1 of art. 62 of the Amendments to the Constitution, which provides, "The credit of the commonwealth shall not in any manner be given or loaned to or in aid of any individual, or of any private association, or of any corporation which is privately owned and managed." The railroad company is obviously a "corporation . . . privately owned and managed." The question for our decision, therefore, is whether by the proposed bill the "credit of the commonwealth" would "be given or loaned."

Prior cases construing art. 62 have usually involved clear instances of a loan of credit of the Commonwealth, by guaranty or otherwise. See opinions advising that no violation of art. 62, § 1, was involved in the particular proposed loan of credit, *Opinions of the Justices,* 261 Mass. 523, 542–545, and 261 Mass. 556, 564, 602–604, both relating to possible guaranty of bonds of public trustees or operators of the Boston Elevated Railway Company or other obligations affecting that company; *Opinion of the Justices,* 322 Mass. 745, 750–753 (guaranty of housing authority obligations). Compare loans of credit which this court advised would be in violation of art. 62, *Opinion of the Justices,* 276 Mass. 617, 620–622 (proposed guaranty of bonds of a private bridge corporation); *Opinion of the Justices,* 291 Mass. 567, 570–571 (guaranty of mortgages given to private institutions). In *Opinion of the Justices,* 309 Mass. 571, 592–594, because the beneficiary of any loan of credit would be a public fund, it was not necessary to consider whether any such loan of credit was in fact proposed.

· Article 62 was adopted in 1918 following the Constitutional Convention of 1917–1918. There is indication in the debates in the convention (vol. 3, pp. 1217–1234, especially at

pp. 1218–1223 and 1230–1232; vol. 4, p. 423) that the amendment was designed solely to force State assistance to public service enterprises to be on a "pay-as-you-go" basis not involving any absolute or contingent debt obligation on the part of the Commonwealth. However, in view of the form of the present proposal, which seems to us to involve no aspect of loan of credit, we need not determine the precise scope of the prohibition found in art. 62.

Because the transaction involves cash payments by or in its behalf, the Commonwealth would not lend its funds or credit to the railroad company or guarantee or insure the latter's obligations. Indeed, the only grant of credit would be by the railroad company to the Commonwealth, since the payment for the option and other rights under the proposed contract would be in instalments. If the Legislature as a matter of policy should authorize the making of the proposed contract, the Commonwealth would then bind itself to pay $900,000 to the railroad company for an option, which the railroad company is not now bound to grant or extend, and for making available service valuable to the community, which the railroad company is not presently bound to render. Continuance of service, indeed, might well have some effect in preserving the going concern value of the property subject to the option during a substantial part of the option period. As was said on somewhat similar facts in *Millard* v. *Roberts*, 202 U. S. 429, 437 (discussed below on another point), it would be "a simple case of bargain and sale, like any other purchase."

Question 1 is answered, "No."

We turn to question 3, which is whether the proposed legislation is a "money bill" within the purview of Part II, c. 1, § 3, art. 7, of our Constitution which provides that "All money bills shall originate in the house of representatives; but the senate may propose or concur with amendments, as on other bills." If the proposed bill is to be regarded as a money bill the conclusion must rest on the fact that the bill provides (§ 3) that the funds to pay for the

option and the related continuance of service are to be raised by local taxation in the annual property tax assessment under G. L. c. 59, § 23, for 1958 in Boston and by assessments by the Commonwealth under G. L. c. 59, § 20, upon certain other cities and towns of the amount of the last three instalments in proportions stipulated in the bill.

Although the precise question here presented was not dealt with, an exhaustive discussion of the history and background of the money bill provision prior to its adoption in our Constitution, and the usages and practices under it thereafter, will be found in *Opinion of the Justices*, 126 Mass. 557, 567–602. It was there said, at page 601, that "the exclusive constitutional privilege of the House of Representatives to originate money bills is limited to bills that transfer money or property from the people to the State, and does not include bills that appropriate money from the Treasury of the Commonwealth to particular uses of the government."

A money bill clause quite similar to ours is contained in art. 1, § 7, of the Constitution of the United States which provides that "All bills for raising revenue shall originate in the house of representatives." See *Opinion of the Justices*, 126 Mass. 557, 593–594, where it is strongly intimated that the phrase "bills for raising revenue" in the Federal Constitution is the equivalent of "money bills" in ours. Under the decisions of the Supreme Court of the United States construing this clause it is plain that legislation of a sort here involved would not be deemed a bill for "raising revenue" or its equivalent. In *United States* v. *Norton*, 91 U. S. 566, at page 569, it was said by Mr. Justice Swayne, "The construction of this limitation is practically well settled by the uniform action of Congress. According to that construction, it 'has been confined to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes which incidentally create revenue.' Story on the Const., sect. 880." In *Twin City Bank* v. *Nebeker*, 167 U. S. 196, the court had before it an

act of Congress providing a national currency which imposed a tax upon the average amount of the notes of a national banking association in circulation. In holding that the act was not a revenue measure, the court said, at page 203, "There was no purpose by the act or by any of its provisions to raise revenue to be applied in meeting the expenses or obligations of the Government." But a decision much closer to the problem at hand is *Millard* v. *Roberts*, 202 U. S. 429. There an act of Congress, which had originated in the Senate, appropriated money to be paid to railroad companies to carry out a scheme of public improvements in the District of Columbia, including the elimination of grade crossings and the building of a station. The act further provided for the levying and assessment of taxes on property in the District to pay for these improvements. It was contended that this was a bill for "raising revenue" and ought to have originated in the House of Representatives. On the authority of *Twin City Bank* v. *Nebeker*, 167 U. S. 196 (cited above), the court rejected this contention and held that the act was not a revenue measure, saying, "Whatever taxes are imposed are but means to the purposes provided by the act" (page 437).

In view of the close similarity of the Federal provision to ours and the fact that both provisions were adopted almost contemporaneously, we are disposed to construe our provision in like manner. Under such a construction it is obvious that the proposed legislation is not a money bill. Such taxes as are imposed locally to reimburse the Commonwealth for expenditures made by it are purely incidental to the main objects of the bill.

The conclusion that the proposed bill is not a money bill finds support in decisions from other jurisdictions construing similar constitutional provisions. *Geer* v. *Commissioners of Ouray County*, 97 Fed. 435, 439–440 (8th Cir.). *Chicago, Burlington & Quincy R. R.* v. *School Dist. No. 1*, 63 Colo. 159. *Stith Petroleum Co.* v. *Department of Audit & Control*, 211 Ind. 400, 404–405. *Ennis* v. *State Highway Commission*, 231 Ind. 311, 322. *Lang* v. *Commonwealth*, 190 Ky. 29, 34.

*Mikell* v. *Philadelphia School Dist.* 359 Pa. 113. See note 4
A. L. R. 2d 973, 984–986.

To question 3 we answer, "No."

> RAYMOND S. WILKINS.
> JAMES J. RONAN.
> JOHN V. SPALDING.
> HAROLD P. WILLIAMS.
> EDWARD A. COUNIHAN, JR.
> ARTHUR E. WHITTEMORE.
> R. AMMI CUTTER.