NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11883

OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.


General Court.  Constitutional Law, General Court, Appropriation
     of money, Taxation.  Statute, Appropriation of money,
     Amendment.  Taxation.


     On June 15, 2015, the Justices submitted the following
response to questions propounded to them by the House of
Representatives.


     To the Honorable the House of Representatives of the

Commonwealth of Massachusetts:

     The undersigned Justices of the Supreme Judicial Court

respectfully submit this response to the questions set forth in

an order adopted by the House of Representatives on May 22,

2015, and transmitted to us on that date.  The order poses five

questions concerning the State budget legislation for fiscal

year 2016.  All of the questions involve Part II, c. 1, § 3,

art. 7, of the Massachusetts Constitution, which we will refer

to as the origination article.[1]  They ask, among other things,

---

[1] Part II, c. 1, § 3, art. 7, of the Massachusetts
Constitution provides:  "All money bills shall originate in the

whether certain provisions in the House budget bill rendered it a "money bill" within the meaning of the origination article, and whether the Senate improperly "originated" a money bill in violation of this article.

As explained below, we are of the view that the House bill was a money bill, and that the Senate did not improperly originate a money bill.[2]

Bills and amendments at issue.  We begin by summarizing the history of the various bills and amendments that give rise to the questions, and by describing generally the provisions that are at issue, reserving for later a more detailed analysis of the legal effect of those provisions.

On March 4, 2015, acting pursuant to art. 63, § 2, of the Amendments to the Massachusetts Constitution, as amended by art. 107 of the Amendments, and pursuant to G. L. c. 29, § 7H, the Governor filed with the House his recommended budget for fiscal year 2016, which, as is customary, was designated House No. 1.  Among its many provisions was section 27, entitled

---

house of representatives; but the senate may propose or concur with amendments, as on other bills."

[2] We invited interested individuals and organizations to file amicus briefs on or before June 5, 2015.  We acknowledge the receipt of briefs from the House of Representatives; the Senate; Senators Bruce Tarr, Robert Hedlund, Richard Ross, Donald Humason, Viriato de Macedo, and Ryan Fattman, comprising the Senate Republican caucus; and attorney Peter Vickery.

"Delay FAS 109 Deduction,"[3] which provided:  "Subsection (2) of section 95 of chapter 173 of the acts of 2008 is hereby amended by striking out the figure '2016', inserted by section 189 of chapter 165 of the acts of 2014, and inserting in place thereof the following figure:- 2017."  The Governor's submission described section 27 as follows:  "This section delays until tax year 2017 the start of the deduction allowed to certain publicly-traded companies to offset increases in their net deferred tax liability that resulted from the commonwealth's implementation of combined reporting."[4]

---

[3] We understand the reference to "FAS 109" as meaning Financial Accounting Standard 109 ("Accounting for Income Taxes") of the Financial Accounting Standards Board.

[4] It suffices to say that G. L. c. 63, § 32B, as amended by St. 2008, c. 173, § 48, requires certain corporations engaged with other, affiliated corporations in a "unitary business" to report their income on a combined basis.  At the same time it rewrote G. L. c. 63, § 32B, to create this requirement, the Legislature also provided a deduction for such corporations designed to offset any increases in their net deferred tax liability that would result from the combined reporting.  See St. 2008, c. 173, § 95 (2).  The deduction was to be spread over a seven-year period "beginning with the combined group's taxable year that begins in 2012."  Id.  In each of the annual budget acts beginning with fiscal year 2012, however, the Legislature postponed the start date of the deduction by one year.  So, for example, the budget act for fiscal year 2012 postponed the deduction until tax year 2013 (see St. 2011, c. 68, § 136), the budget act for fiscal year 2013 postponed it until 2014 (see St. 2012, c. 139, § 140), and so on.  The Governor's recommended budget for fiscal year 2016 would have postponed the start date of the deduction for an additional year, until tax year 2017.

House No. 1 was referred to the House committee on ways and means on March 5, 2015.  The committee filed its version of the budget on April 15, 2015, as House No. 3400.  Among its numerous outside sections, House No. 3400 contained section 48, the language of which was identical to section 27 of House No. 1, i.e., the delay of the so-called FAS 109 deduction for corporations reporting on a combined basis.  The House thereafter engaged in extensive debate on House No. 3400, during which it considered in excess of 1,000 amendments, including one that is particularly important to the questions that are now before us, amendment 685, entitled "For Expansion of the Conservation Land Tax Credit Program."  The amendment, which was adopted, provides that "Section 38AA (h) of Chapter 63 of the General Laws is hereby amended by deleting '$2,000,000' and replacing it with '$5,000,000'."[5,6]

House No. 3400, as amended, was passed to be engrossed by the House on April 30, 2015, in the form of House No. 3401.  The

---

[5] General Laws c. 63, § 38AA, authorizes a tax credit for a "qualified donation" of "certified land" to a "public or private conservation agency" as defined in the statute.  Section 38AA (h) currently provides in relevant part that "[t]he total cumulative value of the tax credits authorized pursuant to this section and [G. L. c. 62, § 6 (p),] shall not exceed $2,000,000 annually."

[6] As originally introduced, amendment 685 contained no express effective date.  The amendment was changed before being adopted to indicate that the amendment to G. L. c. 63, § 38AA, would take effect on January 1, 2016.

delay of the so-called FAS 109 deduction, proposed by the Governor and adopted by the House, appears as section 48 of House No. 3401. The proposed increase in the amount of the tax credit for qualified donations of land to conservation agencies appears in sections 76 (the substance of the provision) and 77 (its effective date). For convenience, we shall refer to section 48 of House No. 3401 as the delayed FAS 109 deduction provision, and to sections 76 and 77 as the conservation land credit provision.

House No. 3401 was transmitted to the Senate, and referred by the clerk of the Senate to the Senate committee on ways and means, on May 7, 2015. The committee immediately set out to establish its version of the budget, which it completed and reported to the Senate on May 12, 2015. The bill reported from the committee, Senate No. 3, in section 54 contained language identical to the delayed FAS 109 deduction provision in House No. 3401. It had no language comparable to the House's conservation land credit provision, however.

The Senate, like the House, then engaged in extensive debate and considered numerous possible amendments. The final Senate bill, like the final House bill, has many outside sections. Among other things, section 54 continues to contain the delayed FAS 109 deduction provision. Two other sections are also relevant to the questions that are put to us. First, the

Senate adopted amendment 6, entitled "Expand Earned Income Tax Credit and Increase Personal Exemptions," which, among other things, added a new outside section to the Senate bill, section 31D, that would amend G. L. c. 62, § 4, by striking out the current § 4 (b)[7] and replacing it with the following: "Part B taxable income shall be taxed at a rate of 5.15 per cent for tax years beginning on or after January 1, 2016."[8]  Amendment 6 added a further provision, section 107A, stating that the new section 31D would take effect on January 1, 2016.  We will refer to sections 31D and 107A as the Part B income tax provision.

_____

[7] General Laws c. 62, § 4, sets the rates at which Massachusetts residents (and nonresidents in certain circumstances) are taxed on their taxable income.  Section 4 (b) governs so-called Part B taxable income, which includes wages, salaries, tips, and other employee compensation earned in Massachusetts.  As currently written, § 4 (b) sets a rate of 5.3 per cent for tax years beginning on or after January 1, 2002, and establishes a formula by which the rate will decrease by .05 per cent in years when the State achieves certain revenue growth benchmarks.  So, for example, the rate applicable to Part B taxable income was 5.25 per cent for the tax year beginning on January 1, 2013, and 5.2 per cent for the tax year beginning on January 1, 2014, and is 5.15 per cent for the tax year beginning on January 1, 2015.  Section 4 (b), as currently written, further provides that "Part B taxable income shall be taxed at a rate of not less than 5 per cent."

[8] Amendment 6 also added three sections to the bill (sections 31A, 31B, and 31C) that would increase the dollar amount of personal income tax exemptions under G. L. c. 62, § 3, part B, subsections (b) (1), (b) (1A), and (b) (2), for individuals, heads of household, and spouses filing jointly; and one section (section 31E) that would increase the earned income credit for qualifying taxpayers under G. L. c. 62, § 6 (h).

Second, the Senate adopted amendment 836, entitled "Reducing youth consumption of flavored cigars," which added section 34A to the Senate bill. Section 34A, which we will refer to as the flavored cigar excise provision, would, among other things, amend G. L. c. 64C, § 7B (b),[9] by adding a new second paragraph to the statute, providing as follows:

> "In addition to the excise imposed by the preceding paragraph, an excise shall be imposed on fruit-flavored or other nontobacco-flavored cigars and smoking tobacco held in the commonwealth at the rate of 170 per cent of the wholesale price of such products. This excise shall be imposed on cigar distributors at the time the fruit-flavored or other nontobacco-flavored cigars or smoking tobacco are manufactured, purchased, imported, received or acquired in the commonwealth. The excise shall not be imposed on any such cigars or smoking tobacco that: (i) are exported from the commonwealth; or (ii) are not subject to taxation by the commonwealth pursuant to any federal law."[10]

On May 21, 2015, Senate No. 3, as amended, was passed to be engrossed by the Senate, in the form of Senate No. 1930. The Part B income tax provision, which appeared in sections 31D and

---

[9] General Laws c. 64C, § 7B (b), currently provides an excise on "cigars" and "smoking tobacco," as defined in the statute, consisting of forty per cent of the wholesale price of such products. The statute presently makes no mention of "fruit-flavored" or "other nontobacco-flavored" cigars or smoking tobacco.

[10] Amendment 836 also added section 105A to the Senate bill, stating: "The comptroller shall transfer the revenues received under the second paragraph of section 7B of chapter 64C of the General Laws during fiscal year 2016, in an amount not to exceed $4,000,000, to item 4590-0300 for smoking prevention and cessation programs." Line item 4590-0300 is within the appropriation for the Department of Public Health.

107A of Senate No. 3, appears in sections 31F and 109 of Senate No. 1930.  The flavored cigar excise provision, which appeared in section 34A of Senate No. 3, now appears in section 34A of Senate No. 1930.  Other than the section numbers, the provisions are essentially identical.

It is against this backdrop that the budget bills were sent to a conference committee of the House and Senate.  We are aware that the work of the committee has begun and is in progress.

By its order dated May 22, 2015, the House has posed the following five questions to us:

"1.  Does an amendment to an existing session law postponing the effective date of a previously enacted tax expenditure, as set forth in section 48 of House No. 3401, render House No. 3401 a 'money bill' pursuant to Part II, c. 1, § 3, art. 7, of the Constitution of the Commonwealth?

"2.  Does an amendment to an existing General Law increasing the expenditure of tax credits as set forth in section 76 of House No. 3401, render House No. 3401 a 'money bill' pursuant to Part II, c. 1, § 3, art. 7, of the Constitution of the Commonwealth?

"3.  If the answers to question 1 and question 2 are in the negative, would it be violative of Part II, c. 1, § 3, art. 7, of the Constitution of the Commonwealth for the Senate to 'transfer money or property from the people to the State' by initiating the repeal of the current statutory mechanism requiring the tax rate on personal income be set at 5% upon satisfaction of certain fiscal requirements and replacing that reduction mechanism with a permanently fixed tax rate on personal income of 5.15% as set forth in section 31D of Senate No. 3?

"4.  If the answers to question 1 and question 2 are in the negative, would it be violative of Part II, c. 1, § 3, art. 7, of the Constitution of the Commonwealth for the Senate to 'transfer money or property from the people

to the State' by initiating a new tax on certain tobacco products as set forth in section 34A of Senate No. 3?

"5. If the answer to question 1 or question 2 is in the affirmative, does the substitution by the Senate of the text of Senate No. 3 for the text of House No. 3401 result in the Senate originating a money bill in violation of Part II, c. 1, § 3, art. 7, of the Constitution of the Commonwealth?"

The House order expresses grave doubt as to whether its budget bill, House No. 3401, as engrossed and transmitted to the Senate, was a "money bill" for purposes of the origination article; as to whether the Senate had the authority to insert its tax-related provisions into the bill that originated in the House; and as to the constitutionality of the Part B income tax provision and the flavored cigar excise provision in the Senate bill if enacted into law.[11],[12]

Use of the advisory opinion process. We next consider whether the House's questions can properly be answered in an advisory opinion. We are of the view that they can in these circumstances.

---

[11] Because the House's questions refer to Senate No. 3, we will do the same in our analysis. As stated above, we understand that Senate No. 3 has been reprinted as amended and now appears as Senate No. 1930.

[12] In the interest of hewing closely to the questions that have been posed, we have limited this summary to the provisions cited in the House's order. We have not undertaken to identify other provisions of the House and Senate bills that may pertain to taxes or, in a broader sense, revenue. Nor have we undertaken to identify the areas on which the House and Senate bills are in agreement.

The advisory process is rooted in Part II, c. 3, art. 2, of the Massachusetts Constitution, as amended by art. 85 of the Amendments. This article authorizes the Governor, the Executive Council, and each branch of the Legislature to call on the Justices for "opinions . . . upon important questions of law, and upon solemn occasions."[13] The Constitution requires the Justices to respond to such questions when properly put, but the Constitution simultaneously imposes on us an obligation not to respond unless we are first satisfied that the elements of Part II, c. 3, art. 2 -- namely, an important question of law and a solemn occasion -- exist. See Opinion of the Justices, 430 Mass. 1205, 1207 (2000); Answer of the Justices, 319 Mass. 731, 733-734 (1946); Answer of the Justices, 150 Mass. 598, 601 (1890).[14]

_____

[13] When presented with a request for an advisory opinion, the Justices do not sit in their usual role, as a court, adjudicating a case or controversy. Advisory opinions are given by the Justices as individuals in their capacity as constitutional advisers to the other branches of Government. Opinion of the Justices, 341 Mass. 738, 748 (1960), citing Commonwealth v. Welosky, 276 Mass. 398, 400 (1931), cert. denied, 284 U.S. 684 (1932).

[14] The elements of Part II, c. 3, art. 2, have been described as "jurisdictional boundaries," Answer of the Justices, 444 Mass. 1201, 1204 (2005), that "cannot be crossed." Answer of the Justices, 362 Mass. 914, 917 (1973). "The Justices must adhere strictly" to these boundaries "in order to safeguard the separation of powers embodied in art. 30 of the Massachusetts Declaration of Rights." Answer of the Justices, 444 Mass. at 1204. Article 30 "acts as an inhibition upon the Justices giving opinions as to the duties of either the

There is no doubt that the questions presented by the House are "important questions of law."  All of the questions concern a provision, the origination article, that has been in the Massachusetts Constitution for 235 years; was a model for the cognate Federal constitutional provision and for similar provisions in the Constitutions of other States; articulates a significant distinction between the powers of the two branches of the Legislature; yet has generated remarkably little discussion in the decided cases and the advisory opinions of the Justices in Massachusetts (or elsewhere).  It also appears that this provision has been interpreted and applied differently by different Senate presidents and senators.  In short, the questions are important, unresolved, and challenging to answer.

We are somewhat more concerned with the requirement that an advisory opinion only be given on a "solemn occasion."  In an often-repeated formulation, the Justices said more than a century ago that a solemn occasion "means some serious and unusual exigency," such as when "either branch of the Legislature, having some action in view, has serious doubts as to their power and authority to take such action, under the

---

executive or legislative department except under the Constitution."  Id. at 1205, quoting Answer of the Justices, 214 Mass. 602, 604 (1913).  See Answer of the Justices, 373 Mass. 898, 901 (1977); Opinion of the Justices, 314 Mass. 767, 770 (1943); Answer of the Justices, 150 Mass. 598, 601 (1890).

Constitution, or under existing statutes."  Answer of the
Justices, 148 Mass. 623, 625-626 (1889).  The Justices have
consistently construed this language strictly, as meaning "that
opinions are required 'only respecting pending matters in order
that assistance may be gained in the performance of a present
duty.'"  Answer of the Justices, 444 Mass. 1201, 1202 (2005),
quoting Answer of the Justices, 211 Mass. 630, 631 (1912).  See
Answer of the Justices, 426 Mass. 1201, 1203 (1997).[15]

Here the House's questions inquire as to the effect of two
bills -- House No. 3401 and Senate No. 3 -- that have already
been passed.  If, on the one hand, we read the questions
literally, they do not ask about a "pending matter," but only
about action that has already been taken.  By contrast, when we
are asked for our views on the constitutionality of a bill that
is pending and not yet passed, it is easier to see that there is
a "pending matter" and a "present duty."  If, on the other hand,
we read the House's questions more broadly in light of the
stated concern in its order about the constitutionality of
Senate No. 3 if enacted into law, then the questions would
appear to be asking about an "abstract" or "hypothetical"

_____

[15] A further, but related, limitation on our duty to respond
is that we are not constitutionally permitted to respond to
"abstract" or "hypothetical" questions.  See Answer of the
Justices, 426 Mass. 1201, 1204-1205 (1997), and authorities
cited.

situation only; this is so because we do not know at this juncture whether the specific language in Senate No. 3 with which the House is concerned -- the Part B income tax provision and the flavored cigar excise provision -- will even survive the conference committee and go before the House and Senate for a full and final vote.[16]

That said, we conclude that we are presented with a "solemn occasion."  We reach this conclusion because we are aware that the entire fiscal year 2016 budget legislation remains "pending" and is currently being considered by the conference committee, where the appointed members are attempting to reconcile the differences between the House and Senate bills.  The "present duty" of the House, through its appointees to the conference, is to negotiate a final bill.  Mindful that the conference process is first and foremost a political process in which the Justices properly have no role, we accept that there is a significant, unresolved legal question of constitutional dimension looming in the present circumstances and a dearth of Massachusetts case law

---

[16] In other words, if the questions are read literally then they come too late, and if they are read broadly then they come too early.  There would be no such concerns about the existence of a "solemn occasion" if -- after the conference process was complete, and if the Senate provisions were included in the final bill -- the questions were put to us before a final vote in the full House and Senate.  Then, unlike the present situation, we would be faced with a known bill that has yet to be voted on.

(and only a few advisory opinions) to which the House might look for guidance. We are satisfied in these circumstances that the House order is a proper attempt to obtain our advisory views on the constitutionality of its options in conference, and we expect that our answers to these questions will therefore assist the members of the committee as they go about their present conference duties.

Questions 1 and 2. The first and second questions submitted to us ask whether the delayed FAS 109 deduction provision and the conservation land credit provision, respectively, render House No. 3401 a "money bill." For the reasons we describe, we conclude that House No. 3401 is, indeed, a money bill.

The origination article has provided since the inception of our Constitution that "[a]ll money bills shall originate in the house of representatives; but the senate may propose or concur with amendments, as on other bills." Part II, c. 1, § 3, art. 7, of the Massachusetts Constitution. This provision grew out of the ancient English tradition regarding taxation, that "all grants in Parliament of subsidies to the King must begin in the House of Commons" and not in the unelected House of Lords. See Opinion of the Justices, 126 Mass. 557, 567 (1878).[17] Comparable

_____

[17] As early as 1781, the Justices of this court observed that the rationale underlying the English tradition does not

provisions have been adopted by approximately twenty States. See Medina, The Origination Clause in the American Constitution: A Comparative Survey, 23 Tulsa L.J. 165, 166 (1987). The United States Constitution, too, contains an "origination clause," art. I, § 7, cl. 1, of the United States Constitution,[18] which was modeled on our own. See Opinion of the Justices, 126 Mass. at 593-594. Although the Federal courts' decisions interpreting the Federal origination clause do not bind us, we have given careful consideration to those decisions when construing our own origination article, given that the two provisions are similarly worded and were adopted almost contemporaneously. See Opinion of the Justices, 337 Mass. 800, 810 (1958) (noting, in light of "close similarity" of Massachusetts and Federal provisions and "almost contemporaneous[]" adoption of both, that Justices were "disposed to construe our provision in like manner"); Opinion of the Justices, 126 Mass. at 593-594.

The Justices of this court have discussed the meaning of the term "money bill" on three prior occasions. In our earliest

transfer readily to post-Revolution Massachusetts, in which "[t]he Senate . . . are as much the immediate choice of the people, as the members of the House of Representatives." Opinions of the Justices, 126 Mass. 547, 552 (1781).

[18] The Federal origination clause states: "All bills for raising revenue shall originate in the house of representatives; but the senate may propose or concur with amendments as on other bills." Art. I, § 7, cl. 1, of the United States Constitution.

reported advisory opinions, the Justices stated that an examination of valuation reports prepared by the towns and plantations of the Commonwealth was not a money bill and, therefore, not subject to the origination article. See Opinions of the Justices, 126 Mass. 547 (1781). One century later, the Justices opined that the origination article does not apply to "bills that appropriate money from the Treasury of the Commonwealth to particular uses of the government, or bestow it upon individuals or corporations," Opinion of the Justices, 126 Mass. at 601; rather, it is "limited to bills that transfer money or property from the people to the State." Id.

The Justices analyzed the scope of the origination article most recently in 1958, providing an advisory opinion to the Senate concerning a bill designed to permit the Commonwealth to maintain railroad passenger services on a segment of the former Old Colony lines. See Opinion of the Justices, 337 Mass. at 801-803. The funding for costs entailed by that bill was to be raised by local property taxes and by assessments on certain cities and towns. See id. at 803, 808-809. The Justices noted that the Federal origination clause "has not been understood to extend to bills for other purposes which incidentally create revenue." Id. at 809, quoting United States v. Norton, 91 U.S.

566, 569 (1875).[19],[20]  Reasoning that "[s]uch taxes as are imposed locally [by the bill] to reimburse the Commonwealth for expenditures made by it are purely incidental to the main objects of the bill," the Justices concluded that the origination article did not apply.  See Opinion of the Justices, 337 Mass. at 810.

With this background in mind, we come to the view that House No. 3401 is a money bill subject to the origination article.  For one, the delayed FAS 109 deduction provision effectively increases the amount of tax revenue that the Commonwealth will realize from certain corporations in fiscal year 2016, by making those corporations ineligible for a tax deduction in that year.  See note 4, supra.[21]  By dint of this

---

[19] It was in this context, distinguishing money bills from "bills for other purposes which incidentally create revenue," Opinion of the Justices, 337 Mass. 800, 809 (1958), that the Justices quoted additional language from United States v. Norton, 91 U.S. 566, 569 (1875), according to which the origination requirement applies to "bills to levy taxes in the strict sense of the words."

[20] The courts of other States have generally maintained likewise that bills that create revenue "incidentally" only are not subject to those States' origination provisions.  See, e.g., Thomas v. Alabama Mun. Elec. Auth., 432 So. 2d 470, 479 (Ala. 1983); Colorado Nat'l Life Assur. Co. v. Clayton, 54 Colo. 256, 259 (1913); Baines v. New Hampshire Senate President, 152 N.H. 124, 136 (2005); Wallace v. Gassaway, 148 Okla. 265, 268 (1931); Mikell v. School Dist. of Philadelphia, 359 Pa. 113, 118 (1948); Andrews v. Lathrop, 132 Vt. 256, 265 (1974).

[21] According to House No. 3401, section 1, the delayed FAS 109 deduction provision will generate $45.8 million in revenue

provision, House No. 3401 is a money bill within the narrow meaning that the Justices have ascribed to this term in the past:  it "transfer[s] money or property from the people to the State."  Opinion of the Justices, 126 Mass. at 601.[22]

The conservation land credit provision also affects the amount of tax money that will be transferred from the people to the Commonwealth.  That provision reduces the Commonwealth's

---

for the Commonwealth in fiscal year 2016.  The fact that this provision also is anticipated to reduce the amount of revenue that will be realized by the Commonwealth in a future year is too attenuated to affect our analysis, primarily in view of the difficulty of predicting whether revenue foregone in the future will equal or exceed in value the revenue gained in 2016.

[22] We recognize that there are certain lines of similarity between tax deductions and appropriations of money from the treasury of the Commonwealth.  See, e.g., G. L. c. 29, §§ 1, 5B (Commissioner of Revenue is required to prepare annual estimates of Commonwealth's "tax expenditures," defined in part as "tax revenue foregone as a direct result of . . . exemptions, deferrals, deductions from or credits against taxes"); Opinion of the Justices, 401 Mass. 1201, 1203-1204 (1987) (permissibility of statute granting tax deduction for educational expenses must be tested under "'anti-aid' amendment," art. 46, § 2, of Amendments to Massachusetts Constitution, because "tax subsidies or tax expenditures of this sort are the practical equivalent of direct government grants"). Still, "[t]he act of taking less money from a taxpayer because of the grant of a tax credit or a tax deduction is not an appropriation of funds from the State treasury or from anywhere else."  Tax Equity Alliance For Mass., Inc. v. Commissioner of Revenue, 401 Mass. 310, 316 (1987).  A bill that makes a tax deduction unavailable in a given year is even farther removed from the category of "bills that appropriate money from the Treasury of the Commonwealth to particular uses of the government, or bestow it upon individuals or corporations," which are not subject to the origination article.  See Opinion of the Justices, 126 Mass. 557, 601 (1878).

expected tax revenue, by raising the maximum tax credit that may be claimed by taxpayers donating certain land to conservation agencies.  See note 5, supra.  The question thus arises whether a bill concerning the "transfer [of] money or property from the people to the State," Opinion of the Justices, 126 Mass. at 601, is a money bill even where it causes the amount of revenue being transferred to the State to be less than it would have been under the preexisting legislative scheme.[23]  We note that the United States Supreme Court has not addressed this issue under the Federal origination clause.  The majority of United States Circuit Courts of Appeals have held that "all legislation relating to taxes (and not just bills raising taxes) must be initiated in the House."  Armstrong v. United States, 759 F.2d 1378, 1381 (9th Cir. 1985), citing Wardell v. United States, 757 F.2d 203, 205 (8th Cir. 1985), Heitman v. United States, 753 F.2d 33, 35 (6th Cir. 1984), and Rowe v. United States, 583 F. Supp. 1516, 1519 (D. Del.), aff'd, 749 F.2d 27 (3d Cir. 1984).

---

[23] Our attention has been directed to a "drafting manual" prepared by the House and Senate Counsel in 2010.  That manual defines "money bills" as bills "that affect state tax revenue for general purposes," and states that "[a] 'money bill' may either reduce general state tax revenue or increase state tax revenue."  Massachusetts Gen. Ct., Legislative Research and Drafting Manual, pt. 5, § F (5th ed. 2010) (General Court Drafting Manual).

But see <u>Bertelsen</u> v. <u>White</u>, 65 F.2d 719, 722 (1st Cir. 1933).[24]
Given that the delayed FAS 109 deduction provision increases the
Commonwealth's anticipated tax revenue for the upcoming fiscal
year and thereby renders House No. 3401 a money bill, we do not
express a view on this issue under our own origination article.

As previously mentioned, a bill devoted to another purpose
or purposes that "incidentally create[s] revenue" is not a money
bill. See <u>Opinion of the Justices</u>, 337 Mass. at 809, quoting
<u>United States</u> v. <u>Norton</u>, 91 U.S. at 569. For two reasons, we do
not view House No. 3401 as such a bill. First, the types of
bills that we and the United States Supreme Court have situated
in this category of bills have been devoted to specific, well-
defined programs and goals. See <u>Opinion of the Justices</u>, 337
Mass. at 801-803 (railroad passenger services on former Old
Colony lines); <u>United States</u> v. <u>Munoz-Flores</u>, 495 U.S. 385, 397
(1990) (fund for programs that compensate and assist crime
victims); <u>Millard</u> v. <u>Roberts</u>, 202 U.S. 429, 436 (1906) (railroad
projects in District of Columbia); <u>Twin City Bank</u> v. <u>Nebecker</u>,

---

[24] The State courts to have addressed this issue have
disagreed as to whether a bill that decreases revenue is subject
to those States' origination provisions. Compare, e.g., <u>Perry
County</u> v. <u>Selma, Marion & Memphis R.R.</u>, 58 Ala. 546, 557 (1877)
(bill exempting certain railroad property from taxation "in one
sense, reduced the taxes," but "was, nevertheless, a bill to
raise revenue"), with <u>In re Paton's Estate</u>, 114 N.J. Eq. (13
Backes) 324, 327-328 (Prerogative Ct. 1933) (bill exempting
certain transfers from inheritance transfer tax would decrease
revenue and was therefore not "bill for raising revenue").

167 U.S. 196, 202-203 (1897) (introduction of national currency).[25] House No. 3401, by contrast, serves a multitude of purposes. As the House's version of the "general appropriation bill," required annually by art. 63, § 3, of the Amendments to the Massachusetts Constitution,[26] House No. 3401 contains three detailed sections concerned with the Commonwealth's appropriations for the upcoming year; but it also features more than one hundred outside sections, devoted to topics ranging from the registration of "home infusion pharmacies" (sections 39A and 39B, proposing amendments to G. L. c. 112, § 39C) to the timeframe for certain proceedings before the Sex Offender Registry Board (section 109, proposing an amendment to G. L. c. 30A, § 14). A bill designed to implement so broad an array of legislative goals cannot soundly be said to have one or

---

[25] The General Court Drafting Manual, supra, states that "the Senate could originate a bill raising the following kinds of revenue: Non-tax revenue, such as fees or fines. Local taxes, including property taxes or assessments. State tax revenue specifically earmarked for a particular program." (Citations omitted.)

[26] We interpret art. 63, § 3, of the Amendments to the Massachusetts Constitution "in harmony with the other parts of the Constitution so as to make the whole a consistent frame of government." Opinion of the Justices, 237 Mass. 598, 608 (1921). For this reason, and consistent with the phrasing of questions 1 and 2, we assume that, when the General Court passes general appropriation bills, it is required do so subject to the constraints of the origination article.

more "main objects," see Opinion of the Justices, 337 Mass. at 810, to which revenue creation is incidental.

Second, we would not consider House No. 3401 to be a bill that creates revenue "incidentally" even if we were to assume that the bill's single most prominent purpose is, as its title suggests, to "mak[e] appropriations."[27] General appropriation bills are required by our constitution to be "based upon the budget" recommended by the Governor.[28] See art. 63, § 3, of the Amendments to the Massachusetts Constitution. The Governor's budget must "contain a statement of all proposed expenditures of the commonwealth for the fiscal year . . . and of all taxes, revenues, loans and other means by which such expenditures shall be defrayed." Art. 63, § 2, of the Amendments to the Massachusetts Constitution. That is to say, the universe of

---

[27] The full title of House No. 3401 is "An act making appropriations for the fiscal year two thousand sixteen for the maintenance of the departments, boards, commissions, institutions and certain activities of the commonwealth, for interest, sinking fund and serial bond requirements and for certain permanent improvements."

[28] The Governor's recommendation, like other recommendations made to the Legislature, as well as public debates, lobbying efforts, or other acts predating the passing of a bill in one of the branches of the Legislature, is not a part of the legislative process governed by the origination article. "[T]he clause in the Constitution, that 'money bills shall originate in the House of Representatives,' . . . respects acts of legislation only." Opinions of the Justices, 126 Mass. at 551. The first piece of proposed legislation in the budget process is House No. 1, which "originate[s] in the house of representatives" within the meaning of the origination article.

appropriations brought together in a general appropriation bill -- those necessary to conduct the general business of the Commonwealth in the coming year -- is by nature intertwined with measures designed to ensure that the necessary funds are available in the Commonwealth's coffers. In this sense, the revenue provisions at issue here in the general appropriation bill for fiscal year 2016 are not "incidental" to a particular purpose (except in the sense that all tax legislation is intended to support the Commonwealth's expenditures); rather, these provisions "raise[] revenue to support Government generally." United States v. Munoz-Florez, 495 U.S. at 398.

Our response to questions 1 and 2 is therefore that House No. 3401 is a "money bill" by virtue of the delayed FAS 109 deduction provision, irrespective of whether the conservation land credit provision also would render the bill a money bill.

Questions 3 and 4. Given that questions 3 and 4 are contingent on negative answers to both questions 1 and 2, and we have not given negative answers to those questions, we need not answer questions 3 and 4.

Question 5. We read the final question essentially as follows. Even if House No. 3401 is a money bill -- as we have said, supra, that it is -- did the manner in which the Senate adopted Senate No. 3 amount to "origination" of a new money bill, in violation of the origination article? We conclude that

it did not; namely, that Senate No. 3 remains a money bill that originated, as required, in the House of Representatives.[29]

This final question assumes, as do we, that Senate No. 3 made comprehensive revisions to House No. 3401. In our view, these revisions did not amount to the origination of a new bill. The origination article provides that, when a money bill has originated in the House, "the senate may propose or concur with amendments, as on other bills." Part II, c. 1, § 3, art. 7, of the Massachusetts Constitution. An examination of the journals of the House and the Senate reveals that it is commonplace for one branch of the Legislature to "amend" a bill passed in the other branch by "striking out all after the enacting clause and inserting in place thereof" a different text.[30] The same practice is prevalent in other jurisdictions. See, e.g., Mayes v. Daniel, 186 Ga. 345, 358 (1938) ("As is universally admitted in parliamentary procedure, substitute is merely one method of amending in legislative proceedings"). The Senate's power to

---

[29] For purposes of this question as well, we assume that the origination article applies to annual appropriation bills. See note 26, supra.

[30] See, e.g., 2014 House Doc. No. 4242 (conference committee recommendation on general appropriation bill for fiscal year 2015). See also 2013 Senate Doc. Nos. 1766, 1777, 1811, 1812, 1813, 1829, 1830, 1835, 1841, 1890, 1899; 2014 Senate Doc. Nos. 1975, 1982, 1988, 2010, 2018, 1052, 2055, 2072, 2073; 2013 House Doc. Nos. 3580, 3581, 3727, 3759; 2014 House Doc. Nos. 4036, 4307, 4308, 4366, 4374, 4375, 4376, 4377, 4516.

propose amendments to money bills "as on other bills" thus encompasses even far-reaching alterations.

The Federal courts have so held in interpreting the phrase (identical to that in our origination article), "the senate may propose or concur with amendments as on other bills." Art. I, § 7, cl. 1, of the United States Constitution. Flint v. Stone Tracy Co., 220 U.S. 107, 143 (1911), abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985), concerned a law that, as introduced in the United States House of Representatives, would have created an inheritance tax; the United States Senate amended the bill by enacting a corporate tax instead. The United States Supreme Court rejected an origination clause challenge to the law, stating that

> "[t]he bill having properly originated in the House, we perceive no reason in the constitutional provision relied upon why it may not be amended in the Senate in the manner which it was in this case. The amendment was germane to the subject-matter of the bill, and not beyond the power of the Senate to propose."

Id.

Also instructive are decisions of the United States Circuit Courts of Appeals concerning the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), P.L. 97-248, 96 Stat. 324 (1982). The version of that law introduced in the United States House of Representatives would have reduced total tax revenues by $1 billion between 1982 and 1986. The United States Senate

"replaced the entire text of the House bill except for its enacting clause, and the Senate version . . . increased total revenues by about [$100 billion] between 1983 and 1985." Armstrong v. United States, 759 F.2d 1378, 1380-1381 (9th Cir. 1985) (citations omitted). The Circuit Courts of Appeals relied on Flint v. Stone Tracy Co. in holding that, permissibly, "[t]he bill that ultimately became TEFRA 'originated' in the House as revenue legislation." Armstrong v. United States, supra at 1382, and cases cited. See generally Kysar, The 'Shell Bill' Game: Avoidance and the Origination Clause, 91 Wash. U. L. Rev. 659, 690 (2014). Recently, the Patient Protection and Affordable Care Act, P.L. 111-148, 124 Stat. 119 (2010), has been upheld on similar grounds. See Sissel v. United States Dep't of Health & Human Servs., 951 F. Supp. 2d 159, 169-174 (D.D.C. 2013), aff'd, 760 F.3d 1 (D.C. Cir. 2014).

We need not express a view as to whether an amendment to a money bill might conceivably be so radically "non-germane" to the original bill as to represent a newly originated bill. Even if we were to assume, for purposes of our discussion, that such situations might in principle arise, we would not consider the current circumstances to be one. As we have said, we accept the premise that Senate No. 3 revises House No. 3401 quite comprehensively. Still, much of the original substance remains; as but one illustration, we have already noted that Senate No. 3

continues to include the delayed FAS 109 deduction provision introduced by the House.  Here, too, the amendment made by the Senate was sufficiently "germane to the subject-matter [or multiple subject-matters] of the bill, and not beyond the power of the Senate to propose."  Flint v. Stone Tracy Co., 220 U.S. at 143.

Our answer to question 5 is that the manner in which Senate No. 3 was passed did not amount to the Senate originating a money bill in violation of the origination article.

Conclusion.  In response to questions 1 and 2, we state that House No. 3401 was a money bill.  We do not answer questions 3 and 4.  In response to question 5, we state that the Senate did not originate a money bill.

The foregoing answers are submitted by the Chief Justice and the Associate Justices subscribing hereto on the 15th day of June, 2015.

RALPH D. GANTS

FRANCIS X. SPINA

ROBERT J. CORDY

MARGOT BOTSFORD

FERNANDE R.V. DUFFLY

BARBARA A. LENK

GERALDINE S. HINES